**The EPISCOPAL STUDENT FOUNDATION, d/b/a Canterbury House, Plaintiff,**

**v.**

**The CITY OF ANN ARBOR, and The Ann Arbor Historic District Commission, Defendants.**

**No. 03–CV–70150–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 24, 2004.

Seth M. Lloyd, Katrina Staub, Detroit, MI, for plaintiff.

Michael Wicks, Detroit, MI, for defendant.

## ORDER

### (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BORMAN, District Judge.

This is a case concerning the Defendants' alleged violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc. Now before the Court are Plaintiff's Motion for Summary Judgment and Defendants' Motion for Summary Judgment. The Court heard oral argument on August 18, 2004. Having considered the entire record, and for the reasons that follow, the Court GRANTS the Defendants' motion for summary judgment and DENIES the Plaintiff's Motion for Summary Judgment.

## FACTS

The instant lawsuit involves a dispute between Plaintiff, Canterbury House, a non-profit corporation and instrumentality of the Episcopal Church, and the Defendants, the City of Ann Arbor and the Ann Arbor Historic District Commission (collectively, "Defendants"), over the proposed demolition of Canterbury House's current worship facility and construction of a new building in its place.

Canterbury House is a "religious organization serving students attending the University of Michigan in Ann Arbor, Michigan, and other Ann Arbor residents." (Compl., ¶ 1.) It is currently located in a two-story building at 721 W. Huron Street in Ann Arbor, Michigan. That address is located in the Old Fourth Ward Historic District, one of the oldest districts in the city. (*Id.* at ¶ 2; Ex. 1 to Defs.' Mot.)

Canterbury House contends that it offers an "unconventional approach to religion", emphasizing its spiritual community. It currently offers one weekly worship service at its West Huron facility (its "Jazz Mass"), and sponsors various social events to create a spiritual community for its members. (*Id.* at ¶¶ 11–12.) Those social events include, amongst others, prayer and study groups, an alternative spring break, and a Saturday night concert series. (*Id.* at ¶ 12; *see also* Ex. C to Pl.'s MSJ.)

By offering these events, Canterbury House hopes to provide its members with an atmosphere that is free of drugs, alcohol, and sexual pressures, and thereby assemble a religiously based alternative to the "party scene" usually found on college campuses. (*Id.*) Additionally, by opening its doors to others in the community who are not members of the church, the social activities allow Canterbury House to introduce those individuals to the church, and educate them in its religious mission. (*Id.* at ¶ 13.) Thus, Canterbury House considers its social events to be "vital to the church's growth." (*Id.*) "[S]eeking growth of the church and welcoming others into the congregation", in turn, are "central to" the church's religious mission. (*Id.*)

Likewise, community outreach is central to Canterbury House's religious mission. As an example, Canterbury House's members participate in programs to feed the hungry in its community, and donate proceeds from its concert series to that cause. (*Id.* at ¶¶ 15–16.) Finally, Canterbury House asserts that "having the congregation gather and worship as a whole" is central to its faith and its emphasis on the spiritual community. (*Id.* at ¶ 17.)

In recent years, Canterbury House asserts it has experienced significant growth in its membership and has outgrown its

current facility as a result. (*Id.* at ¶ 19.) Due to the limited worship space in its current facility, Canterbury House contends it has been unable at times to accommodate all of the individuals who wish to attend worship services, and to seek growth. (*Id.* at ¶¶ 20–21.) Similarly, because its current building only has a "small and outdated kitchen" and lacks a dining area, Canterbury House contends it is unable to fulfill its religious mission to help the hungry by preparing and serving meals at the church. (*Id.* at ¶ 22.) Finally, Canterbury House asserts that the current building has no space for a student lounge, and no dedicated space for meditation. (*Id.* at ¶¶ 23–24.) Thus, the church is unable to provide its members with an informal gathering place and an opportunity for individual worship, respectively. (*Id.*)

Given these constraints, the church asserts it can no longer accomplish its religious mission and create a spiritual community for its members in its existing building. Canterbury House asserts it needs a "large and multi-faceted church", but alleges its current building cannot be renovated or expanded in a manner that would satisfy its religious needs. Canterbury House contends, therefore, that it must demolish its current building and build another consistent with its needs.

Moreover, according to Canterbury House, relocation is not a feasible alternative. Canterbury House asserts that in order to serve its student members, many of whom lack transportation, Canterbury House must be located in close proximity to the University of Michigan campus. (*Id.* at ¶ 27.) Canterbury House alleges

that, for years, it has attempted to locate other building sites it could purchase to construct a new church. (Pl.'s MSJ at 5.) It contends, however, that "[v]ery little property that would suit Canterbury House's needs comes on the market" and when it does, "it is sold at very high prices to large developers and the University of Michigan." (*Id.*) As a result, Canterbury House has not found or acquired suitable alternative property close to the university.

Canterbury House's desire to expand its current facility, coupled with its inability to find alternative property, led Canterbury House to apply for a building permit from the Ann Arbor Historic District Commission (the "Historic Commission") on March 1, 2002 [1]. Specifically, Canterbury House sought permission to demolish its current building, in order to construct a new building in its place that would enable it to fulfill its religious mission.

Canterbury House submitted detailed plans of its proposed new building in support of its application. (Ex. G to Pl.'s MSJ.) The proposed church would have a larger meeting room to allow extended seating for worship services. In addition, the new church would have "space specifically devoted to meditation, a large dining area, a lounge, a library, an industrial size kitchen, an elevator, an 'all purpose room' that can be used for various programs, and other offices and work areas." (Pl.'s MSJ at 7.)

On March 14, 2002, the Historic Commission held a public hearing to discuss, amongst other issues, Canterbury House's permit application. The Historic Commis-

---

1. Chapter 13 of Ann Arbor's City Code governs historical preservation, including the demolition of historic structures. That Chapter provides that "no person shall alter, move, or demolish any building, object or site listed in the Register in a manner that affects its exte-

rior appearance visible from a public right-of-way without first obtaining permission from the Historic District Commission and the Building Department." (Ex. E to Pl.'s MSJ at 6.)

sion members generally disfavored the permit because (a) the current building was in good repair, (b) its proposed demolition did not meet the Historic Commission's criteria for granting such permits, and (c) the proposed new building altered the character of the neighborhood, which the Commission believed should be historically preserved. (Ex. H to Pl.'s MSJ at 8–10.) As a result, the proposed demolition and construction was ultimately denied by the Historic Commission. (*Id.*) Members on the Commission did, however, note that they would consider additions to the present structure. (*Id.*) Canterbury House has not proposed additions to its present structure.

Thereafter, Canterbury House filed an appeal with the Michigan Department of History, Arts and Libraries State Historic Preservation Review Board pursuant to M.C.L. § 399.211. On September 12, 2002, the State Historic Preservation Review Board affirmed the Historic Commission's decision.

Consequently, Canterbury House filed the instant lawsuit under 42 U.S.C. §§ 1983 and 1988. In its complaint, Canterbury House asserts that the Historic Commission's denial of its permit application to demolish its existing building and construct a new one in its place, violated Canterbury House's rights to free exercise of religion and freedom of assembly as guaranteed by the First Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc. On August 18, 2004, the parties stipulated to a dismissal of Canterbury House's First Amendment claims. The only claim remaining in this case, therefore, is Plaintiff's claim under the RLUIPA.

## I. The Instant Motion

Now before the Court are Plaintiff's motion for summary judgment and Defendants' motion for summary judgment. Plaintiff asserts summary judgment is appropriate on its claim under the RLUIPA, which prohibits a government entity from imposing a substantial burden on one's religious exercise absent a showing that the government action is the least restrictive means of furthering a compelling interest. Plaintiff argues that Defendants' refusal to grant its permit application constitutes a substantial burden on its religious exercise. (Pl.'s MSJ at 12–16.)

In particular, Canterbury House asserts its assembly has sincerely held religious beliefs, which include:

> providing a spiritual community for its members, creating a progressive and creative worship experience for its members, offering meditation, prayer and study groups for its members, and continually working to welcome new members into the congregation.

(*Id.* at 13.) "Having the congregation gather and worship regularly as a whole is also central to Canterbury House's faith and its emphasis on spiritual community", as is community outreach. (*Id.*)

Plaintiff contends the Historic Commission's permit denial prevents it from engaging in its religious endeavors, and therefore, substantially burdens its free exercise of religion. For example, Plaintiff contends that if it is unable to build a new, expanded church, its congregation may be unable to worship as a whole, as the faith requires. As another example, Plaintiff asserts that as a result of its current space limitations, Canterbury House has been unable to seek growth or welcome new members, contrary to its religious mission.

Given this alleged substantial burden, Plaintiff asserts the Defendants must

demonstrate that the land use regulation in question furthers a compelling government interest, and that the regulation is the least restrictive means of furthering that compelling interest. Plaintiff argues that the Defendants cannot overcome this hurdle because the Historic Preservation Ordinance, and the Historic Commission's denial thereunder, do not further a compelling government interest. Moreover, even if Defendants were able to advance a compelling interest, they cannot demonstrate that the ordinance is the least restrictive means of furthering that interest.

Defendants dispute each of Plaintiff's arguments, and, in fact, argue summary judgment is appropriate in their favor on Plaintiff's RLUIPA claim. Defendants contend that Plaintiff cannot establish that it has suffered a substantial burden on its free exercise of religion. In support, Defendants contend that the Historic Commission's denial of the demolition permit "has not caused Plaintiff to abandon the precepts of its religion nor has it put pressure on Plaintiff to modify its behavior or violate its beliefs." (Defs.' MSJ at 5.) Moreover, Defendants assert that even if the ordinance constitutes a substantial burden, the ordinance furthers a compelling government interest—zoning—and is narrowly tailored to that interest. (Defs.' Resp. to Pl.'s MSJ at 14–18.)

Aside from these statutory arguments, Defendants contest Plaintiff's RLUIPA claim on constitutional grounds. Specifically, Defendants contend that the RLUIPA itself is unconstitutional as it (a) exceeds Congress's power under Section V of the Fourteenth Amendment, (b) exceeds Congress' powers under the Commerce Clause, and (c) violates the Establishment Clause of the First Amendment[2]. Given these statutory and constitutional obstacles, Defendants contend summary judgment is warranted in their favor, not the Plaintiff's.

## ANALYSIS

### I. Standard of Law

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.

**2.** The United States of America has intervened in the action and filed a brief addressing Defendants' constitutionality claims. The United States "takes no position at this time on whether the particular burdens on religious exercise challenged by Plaintiff fall within the scope of RLUIPA's provisions, nor on whether those burdens violate the standards provided for by RLUIPA." (Intervenor's Mot. at 2, n. 2.)

1984) (quoting Black's Law Dictionary 881 (6th ed.1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.; Feliciano v. City of Cleveland,* 988 F.2d 649, 654 (6th Cir.1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548 (1986). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd Cty. Bd. of Ed.,* 106 F.3d 135, 145 (6th Cir.1997); *see also Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 (holding that the non-moving party must produce more than a mere scintilla of evidence to survive summary judgment).

## II. Religious Land Use and Institutionalized Persons Act Claim

Plaintiff argues that the Historic Commission's denial of its application to demolish its existing church violates the Religious Land Use and Institutionalized Persons Act ("RLUIPA") by imposing a substantial burden on its members' religious exercise. Defendants contest Plaintiff's argument, and assert the Commission's decision to deny Plaintiff's permit request did not substantially burden Plaintiff's religious free exercise, as contemplated under the RLUIPA. Even if it did, Defendants assert the RLUIPA is unconstitutional on multiple grounds.

■ At the outset, the Court observes the well-established principle that a court should defer addressing constitutional questions until it has resolved any statutory issues in the suit. If a case may be decided on statutory grounds, the court should refrain from addressing the constitutional issue. *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936)("[i]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction of general law, the Court will decide only the latter.") Thus, the Court begins its analysis by addressing Plaintiff's statutory claims under the RLUIPA.

The RLUIPA, 42 U.S.C. § 2000cc, was recently enacted in response to a series of legislative and judicial pronouncements relating to religious exercise. In *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Supreme Court employed a balancing test to determine whether a legislative enactment violates the First Amendment's Free Exercise Clause. The Supreme Court asked whether the law in question substantially burdened the plaintiff's religious exercise, and if so, whether the burden was justified by a compelling state interest. (*Id.* at 403–09, 83 S.Ct. 1790.) In 1990, however, the Supreme Court declined to apply *Sherbert's* balancing test, and instead held that neutral laws of general applicability that incidentally burden religion do not offend the

Free Exercise Clause. *See Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 878–90, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

In 1993, Congress responded to *Smith* by enacting the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb–2000bb–4. In an attempt to restore *Sherbert's* balancing test, the RFRA mandated that government measures that substantially burden one's exercise of religion constitute the least restrictive means of furthering a compelling government interest. Thereafter, in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court ruled that certain provisions of the RFRA were unconstitutional because their enactment exceeded Congress's enforcement powers under the Fourteenth Amendment.

Congress again responded, this time by enacting the RLUIPA. The RLUIPA applies to government actions affecting religious exercise by way of land use regulation—at issue in this case—or a regulation applicable to institutionalized persons. RLUIPA's land use provisions establish the general rule that,

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

(42 U.S.C. § 2000cc(a)(1).) The statute limits the scope of the general rule to any case in which,

> (A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;
>
> (B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability; or
>
> (C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

(42 U.S.C. § 2000cc(a)(2).) Thus, a plaintiff is entitled to protection under the RLUIPA if the plaintiff satisfies two separate tests. First, the plaintiff must establish one of three jurisdictional requirements listed under § 2000cc(a)(2)(A) through (C). After meeting the jurisdictional requirements, a plaintiff must satisfy the substantial burden test enunciated under § 2000cc(a)(1). With these prerequisites in mind, the Court turns to the arguments at hand.

### A. Jurisdictional Requirements

■ At the outset, Canterbury House contends that it satisfies two of the three jurisdictional requirements: interstate commerce pursuant to 42 U.S.C. § 2000cc(a)(2)(B), and an individualized assessment of plaintiff's proposed use of the property under 42 U.S.C. § 2000cc(a)(2)(C). The Court finds that Defendants' decision to deny Plaintiff's permit application constitutes an individualized assessment under a land use regulation regarding Plaintiff's proposed use of the property.

A "land use regulation" is defined by the Act as "a zoning or landmarking law, or

the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has ownership,...or other property interest in the regulated land...[.]" (42 U.S.C. § 2000cc–5(5).) Ann Arbor's ordinance, which governs historical preservation, including the demolition of historical structures, certainly qualifies as a "land use regulation" within the Act's purview.

In addition, the Historic Commission's denial of Canterbury House's application to demolish its existing building constitutes an individualized assessment regarding the property's proposed use. Permit applications, like the one at bar, involving property situated in one of Ann Arbor's historic districts, are governed by Chapter 103 of Ann Arbor's City Code. Chapter 103 provides that applications for the alteration, removal, or demolition of a structure within an historic district must be referred to the Historic Commission, and reviewed on an individualized basis. (Ann Arbor Code, Ch. 103, § 8:409(3) at Ex. E to Pl's MSJ at 10.) In deciding whether to grant or deny a given application, the Historic Commission must consider each application individually in light of the five factors enumerated at § 8:409(4)[3], and must disapprove applications "only on the basis of considerations specified" in that section. (*Id.* at § 8:409(5).) The Historic Commission's meeting minutes reveal that the commission did, in fact, review and deny

Plaintiff's application based on the listed criteria. (Historic Commission Meeting Minutes, March 14, 2002 at Ex. H to Pl.'s MSJ.)

It follows, therefore, that the Historic Commission's denial of Plaintiff's permit application constitutes an individualized assessment under a land use regulation. *See Cottonwood Christian Center v. Cypress Redevelopment Agency,* 218 F.Supp.2d 1203, 1222–23 (C.D.Cal.2002)("City's refusal to grant plaintiff's application for conditional use permit 'invites individualized assessments of the subject property and the owner's use of such property[.]' "); *Freedom Baptist Church of Delaware County v. Twp. of Middletown,* 204 F.Supp.2d 857, 868 (E.D.Pa.2002)("Zoning ordinances must by their nature impose individualized assessment regimes. That is to say, land use regulations through zoning codes necessarily involve case-by-case evaluations of the propriety of proposed activity against extant land use regulations."); *Shepherd Montessori Center Milan v. Ann Arbor Charter Township,* 259 Mich.App. 315, 327–28, 675 N.W.2d 271 (2003)(holding zoning ordinance, under which city's zoning board denied plaintiff's application for a use variance, invites personalized assessments of the subject property or use thereof and satisfies the RLUIPA's jurisdictional requirements). Accordingly, the Court finds Canterbury House has satisfied the jurisdictional requirements under 42 U.S.C. § 2000cc(a)(2)(C)[4].

---

**3.** In reviewing an application, the Historic Commission must consider:

    (a) The historical or architectural value and significance of the property and its relationship to the historical value of the surrounding area;

    (b) The relationship of the exterior architectural features of the structure to the rest of the structure and to the surrounding area;

    (c) The general compatibility of the exterior design, arrangement, texture and materials proposed;

    (d) The Secretary of the Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Structures;

    (e) Any other factor, including aesthetics, which the commission considers pertinent. (Ann Arbor Register of Historic Places, Chapter 103, "Historic Preservation", § 8:409(4).)

**4.** In light of this ruling, the Court need not address the remaining jurisdictional arguments advanced by the Plaintiff.

## B. Substantial Burden

The Court now turns to the question of whether Defendants' denial of Plaintiff's application to demolish its existing building constitutes a "substantial burden" on Plaintiff's religious exercise within the meaning of the RLUIPA. As a preliminary issue, however, the Court must address Defendants' argument that Plaintiff has not adequately demonstrated that Defendants' actions burdened its "religious exercise".

### (1) Religious Exercise

Defendants argue that the "religious" activities to which Plaintiff cites to justify demolishing its current facility are not, in fact, religious exercises. (Defs.' Resp. at 8; see also Defs.' MSJ at 5.) In support of this argument, Defendants point to Canterbury House's alleged religious needs to sponsor social events, including its "Saturday night concert series", feed its members and nonmembers, and provide a student lounge and meditation room. (Id. at 3–4, 8; see also Defs.' MSJ at 5..) Defendants also question whether these activities are truly an integral part of Plaintiff's religious exercise, or simply designated as such for purposes of this lawsuit.

Although past cases involving religious free exercise claims under the First Amendment often analyzed whether the "religious exercise" implicated by a particular government action was central to the litigant's faith, the RLUIPA obviates the need for such an analysis by providing a statutory definition of "religious exercise". See Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1225 (11th Cir.2004)(observing that under RLUIPA, courts no longer need to analyze whether a claimed religious activity is an integral part of one's faith). Under the RLUIPA, "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to a system of religious belief."

42 U.S.C. § 2000cc–5(7)(A); see also Hernandez v. Commissioner, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)(holding "it is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.") The RLUIPA only requires that a claimant's beliefs are "sincerely held". See, e.g., Westchester Day School v. Village of Mamaroneck, 280 F.Supp.2d 230, 239 (S.D.N.Y.2003)(noting the government action at issue must compel action or inaction with respect to a sincerely held religious belief.) Taking the evidence in a light most favorable to the Plaintiff, the Court has no reason to doubt Plaintiff's religious beliefs are sincerely held, and will not delve further into those beliefs at this stage.

■ Similarly, the record supports a finding that Plaintiff's activities constitute "religious exercises", as defined by the RLUIPA. First, the RLUIPA specifically contemplates that religious exercise may include the "use, building, or conversion of real property" for religious purposes, as implicated in the case at bar. (42 U.S.C. § 2000cc–5(7)(B).) Second, the religious exercises identified by Plaintiff qualify for RLUIPA's protections.

In this case, Plaintiff claims its religious mission and beliefs include: "providing a spiritual community for its members, creating a progressive and creative worship experience for its members, offering meditation, prayer and study groups for its members, and continually working to welcome new members into the congregation." (Pl.'s MSJ at 13; see also Aff. Deinsen, Feb. 13, 2004 at ¶¶ 10–16.) Community outreach and regular worship as a whole are also "central to Canterbury House's faith and its emphasis on spiritual community." (Id.)

The fact that many of these activities are not confined to religious worship does not mean, as Defendants suggest, that the acts themselves are not religious in nature. In fact, many religions offer services beyond traditional worship services as part of their religious offerings.

For example, churches often participate in charitable activities, or offer meditation and prayer groups to supplement their worship services. Likewise churches regularly hold fundraisers, such as Canterbury House's concert series, to support the church's religious endeavors. Stated differently, even Canterbury House's concert series has a religious purpose, in that it (a) enables the church to collect financial contributions to further the church's mission, and (b) provides members with an opportunity to meet and educate non-members in the community about Canterbury House's religion. In turn, such events enable Canterbury House to seek growth in its local community.

To summarize, the fact the Canterbury House's activities exceed its worship services makes them no less a part of Plaintiff's religious exercise. Given this holding, the Court must now determine whether Defendants' actions substantially burdened Plaintiff's religious exercise.

### (2) Substantial Burden

As several courts have observed, the RLUIPA's history demonstrates that Congress intended to leave in tact the traditional "substantial burden" test, as defined by the Supreme Court's free exercise jurisprudence. *See, e.g., Vineyard Christian Fellowship of Evanston v. City of Evanston,* 250 F.Supp.2d 961, 991 (N.D.Ill.2003); *Grace United Methodist Church v. City of Cheyenne,* 235 F.Supp.2d 1186, 1194 (D.Wyo.2002); *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. City of West Linn,* 192 Or.App. 567, 588, 86 P.3d 1140, 1150 (Or.App.2004). Accordingly, this Court's analysis will be guided by cases applying the substantial burden standard in the free exercise context, as well as recent cases decided under the RLUIPA itself.

■ A review of such cases demonstrates that "substantial burden" has been described in myriad ways. *See, e.g., Sherbert,* 374 U.S. at 404, 83 S.Ct. 1790 (occurs when a person is required to "choose between following the precepts of her religion and forfeiting [government] benefits, on the one hand, and abandoning the precepts of her religion...on the other."); *Thomas v. Review Bd. of the Indiana Empl. Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981)(exists where state "put[s] substantial pressure on an adherent to modify his religious behavior and to violate his beliefs"); *Murphy v. Zoning Comm'n of Town of New Milford,* 148 F.Supp.2d 173, 188–89 (D.Conn.2001)(regulations must have a "chilling effect" on the exercise of religion to substantially burden religion). Conversely, a government regulation does not substantially burden one's religious exercise if it only has an incidental effect that makes it more expensive or difficult to practice the religion. *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio,* 699 F.2d 303, 306 (6th Cir. 1983).

Along these lines, cases addressing alleged infringements of one's free exercise of religion may be loosely, but usefully, categorized into two camps. On the one hand, courts routinely find substantial burdens where compliance with the statute itself violates the individual's religious beliefs and noncompliance may subject him to criminal sanctions or the loss of a significant government privilege or benefit. *See Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct.

1526, 32 L.Ed.2d 15 (1972)(compulsory high school attendance law contrary to Amish religious beliefs); *Sherbert*, 374 U.S. 398, 83 S.Ct. 1790 (denial of unemployment benefits to Seventh Day Adventist who refused to work on Saturday Sabbath). On the other hand, courts have been far more reluctant to find a violation where compliance with the challenged regulation makes the practice of one's religion more difficult or expensive, but the regulation is not inherently inconsistent with the litigant's beliefs. *See Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961)(Sunday closing law made Orthodox Jewish merchants' religious observance more expensive.)

Given this split of authority, it is useful to review the landmark Supreme Court decisions that have shaped free exercise jurisprudence: *Sherbert*, 374 U.S. 398, 83 S.Ct. 1790, *Yoder*, 406 U.S. 205, 92 S.Ct. 1526, and *Braunfeld*, 366 U.S. 599, 81 S.Ct. 1144. In *Sherbert*, the Supreme Court considered whether the denial of unemployment benefits to a Seventh Day Adventist whose employment was terminated for refusing to work on her Sabbath constituted a substantial burden on her religious free exercise. The Court concluded that it did because the state's denial "force[d] her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning the precepts of her religion in order to accept work, on the other[.]" *Sherbert*, 374 U.S. at 399–401, 83 S.Ct. 1790. The Court went on to hold, "[to] condition the availability of benefits upon this applicant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." (*Id.* at 404–06, 83 S.Ct. 1790.) The Sixth Circuit later characterized the infringement found in *Sherbert* as "severe, life-threatening economic sanctions". *Lakewood*, 699 F.2d at 306.

In *Yoder*, the Supreme Court faced the issue of whether a compulsory school attendance law which conflicted with Amish religious beliefs, and which imposed criminal sanctions for noncompliance, violated the free exercise clause. The Court held in the affirmative. In particular, the Supreme Court stated,

> The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs.

*Yoder*, 406 U.S. at 218, 92 S.Ct. 1526.

*Braunfeld*, however, presents an insightful contrast to *Sherbert* and *Yoder*. *Braunfeld* involved a challenge to Pennsylvania's Sunday closing law by Orthodox Jewish merchants who argued that the law effectively required them to make a financial sacrifice to practice their religion. The Supreme Court held that one's religion is not substantially burdened by a statute that makes one's religious observance more difficult or expensive. *Braunfeld*, 366 U.S. at 607, 81 S.Ct. 1144.

More recently, the Supreme Court declined to find a substantial burden in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988), and *Locke v. Davey*, 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004). In the former, various Native American groups challenged the construction of a paved road through federal public land, asserting the construction would harm sacred areas traditionally used for religious rituals. Although the road "would interfere with [the plaintiffs'] ability to pursue spiritual fulfillment according to their own religious beliefs", the Court concluded it would neither coerce the plaintiffs into violating their religious beliefs, nor "penalize religious activity by

denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng*, 485 U.S. at 449, 108 S.Ct. 1319. In the latter case, the Supreme Court held that a state scholarship program that prohibited the use of scholarship funds for students pursuing theology degrees did not violate the Free Exercise Clause. In so holding, the Court noted that the program "imposed neither criminal sanctions or civil sanctions on any type of religious rite", and did not "require students to choose between their religious beliefs and receiving a government benefit." *Locke*, 540 U.S. at ——, 124 S.Ct. at 1308.

Also applying the standards set forth by the Supreme Court in *Sherbert, Yoder,* and *Braunfeld,* the Sixth Circuit addressed a congregation's challenge to its city's comprehensive zoning plan, which prohibited the congregation from constructing a place of worship on land owned by the congregation. *See Lakewood*, 699 F.2d at 305–08. Under the zoning plan, only ten percent of the city's property was designated as land on which a church could be built. The Sixth Circuit noted that the Lakewood ordinance did not prohibit the congregation, or any other faith, from worshiping in the city altogether. The congregation remained free to practice its faith through worship "whether the worship be in homes, schools, other churches, or meeting halls throughout the city." (*Id.* at 307.)

The Sixth Circuit also rejected the congregation's claim that the zoning ordinance imposed a substantial burden because land in commercial zoning districts (in which churches were permitted uses) was more expensive and less conducive to worship than the lot owned by the church. Although the "lots available to the Congregation may not meet its budget or satisfy its tastes", the Sixth Circuit held that the Free Exercise Clause "does not require the City to make all land or even the cheapest or most beautiful available to churches." (*Id.*)

The Sixth Circuit summarized its finding that the zoning ordinance did not impose a substantial burden of the congregation's free exercise by stating,

> [The ordinance] does not pressure the Congregation to abandon its religious beliefs through financial or criminal penalties. Neither does the ordinance tax the Congregation's exercise of its religion. Despite the ordinance's financial and aesthetical imposition on the Congregation, we hold that the Congregation's freedom of religion...has not been infringed.

(*Id.* at 307–08.)

Against this background, the Court now turns to the arguments advanced by Canterbury House. Canterbury House asserts that Defendants' denial of its application to demolish its existing church constitutes a substantial burden on its religious free exercise. In particular, Canterbury House complains that because it cannot use its current building to fulfill all of its religious needs, the congregation must either be permitted to demolish its current facility and build a larger, "multifaceted" facility, or purchase alternative property close to the University of Michigan's Ann Arbor campus (the "University"). According to Canterbury House, the latter alternative is not truly an option because there is "very little property that would suit Canterbury House's needs", and when such property becomes available, Canterbury House is outbid by "large developers" and the University. (Pl.'s MSJ at 5.) Thus, Canterbury House contends its only feasible choice is to demolish its current structure and build a new facility in its place. Because the Historic Commission denied Canterbury House's permit to do so, Canterbury House contends the Defendants have substantially burdened its religious exercise.

■ This Court, however, finds Canterbury House's argument to be inconsistent with the Supreme Court and Sixth Circuit precedent discussed in the preceding paragraphs. The Court finds that the burdens placed upon Canterbury House's religious exercise do not rise to level of severity contemplated by those courts' jurisprudence. Unlike the burdens found in *Yoder* and *Sherbert,* this is not a case where Canterbury House must choose between exercising its religious beliefs and forgoing significant government benefits or incurring criminal or financial penalties. Nor does the denial of Canterbury House's permit prevent it from pursuing its religious beliefs, coerce its members into abandoning or violating those beliefs, or dissuade members from practicing their faith. In fact, the burdens imposed on Canterbury House pale in comparison to the infringing burdens found in *Sherbert* and *Yoder.*

Canterbury House complains that its current limited worship space renders it unable "at times" to allow its members to worship as a whole or to seek new growth, as the faith mandates. In addition, Canterbury House contends it is unable to fulfill its religious mission to help the hungry by preparing and serving meals at the church because its current building only has a "small and outdated kitchen" and lacks a dining area. Finally, Canterbury House asserts that the current building has no space for a student lounge, and no dedicated space for meditation. Thus, the church is unable to provide its members with an informal gathering place and an opportunity for individual worship, respectively.

As a preliminary matter, the Court fails to understand how Defendants' permit denial substantially burdens Plaintiff's religious exercise when the solution to a majority of Plaintiff's myriad constraints appears to lie within Plaintiff's control. Plaintiff admitted at oral argument that its entire second floor—or *one half* of its current building space—is leased to commercial tenants. Given Plaintiff's alleged spacial limitations, it seems rather evident to the Court that rather than leasing that space to outsiders, the church could use its second floor to accommodate its own religious needs. At a minimum, it seems the second floor could be used (or renovated for use) as a meditation room, student lounge, and dining area, and could thereby satisfy many of Plaintiff's demands. Indeed, Plaintiff's counsel essentially conceded as much at oral argument [5].

■■ Even putting aside the "second floor" option, Plaintiff's religious exercise has not been substantially burdened. First, there is no indication that Canterbury House is precluded from fulfilling its religious mission through worship as a whole, or through its various other activities, in other locations throughout the city [6]. *See Lakewood,* 699 F.2d at 307 (holding

---

**5.** Plaintiff's counsel found fault with the Court's suggested "second floor solution" only insofar as Plaintiff requests additional worship space to enable its congregation to gather as a whole. Counsel argued that worship on two levels will not satisfy Canterbury House's need to worship as a whole.

**6.** Indeed, given Canterbury House's close proximity to the University of Michigan's campus, and thus, the University's numerous and cavernous classrooms, auditoriums, and meeting places, it seems highly unlikely that

another suitable facility—both in size and location—is unavailable. Even aside from the University, multiple private venues exist in the City of Ann Arbor, near the University's campus, that would accommodate Canterbury House's 100–120 member parish.

On a side note, the Court notes that the University may open its facilities after hours to religious groups without running afoul of the Establishment Clause's prohibition on aiding or advancing religion. *See Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 395–97[, 113 S.Ct. 2141, 124

zoning ordinance did not infringe on free exercise where it did not prevent congregation from practicing its faith in other "homes, schools, other churches, or meeting halls throughout the city.") Nothing in the record suggests that Canterbury House could not lease or sublease an existing church or meeting hall to facilitate its worship as a whole, or its other religious endeavors. *See Love Church v. City of Evanston,* 671 F.Supp. 508, 513–14 (no substantial burden where record did not demonstrate plaintiffs could not lease or sublease other venues within the city.) Although "[t]hese alternatives may be less appealing or more costly", neither the RLUIPA, nor the Constitution, requires Ann Arbor to subsidize the real estate market[7]. *(Id.)*

Equally important, the record demonstrates that Canterbury House presently offers or participates in many, if not all, of the religious activities which it cites in support of its substantial burden. For example, the record reveals that Canterbury House currently contributes financial assistance to the Ann Arbor Hunger Coalition, and its members currently prepare and serve meals "at many different local churches." (Letter from Ann Arbor Hunger Coalition, March 13, 2002, Ex. D to Pl.'s MSJ.) Although it may be "incredibly beneficial" if Canterbury House were able to offer its own kitchen and dining room for such services, there is no indication that Canterbury House cannot continue to feed the hungry at such alternate locations, and thus fulfill its religious mission. *See Daytona Rescue Mission, Inc. v. City of Daytona Beach,* 885 F.Supp. 1554, 1560 (M.D.Fla.1995)(denial of special use permit did not substantially burden plaintiff's free exercise where plaintiff failed to show that city' code prevented it from running shelter or food programs anywhere in Daytona Beach.)

Likewise, the evidence in the record indicates that Canterbury House currently

L.Ed.2d 352] (1993)(holding no Establishment Clause violation for a school to grant after-hours access to its facilities to a religious group when the school had made its facilities available to a wide variety of public organizations); *Widmar v. Vincent,* 454 U.S. 263, 270–75[, 102 S.Ct. 269, 70 L.Ed.2d 440] (1981)(holding that university could allow religious group to use university facilities that were generally available to other student groups without offending the Establishment Clause); *Rusk v. Crestview Local School District,* 379 F.3d 418, 2004 Fed.App. 0267P (6th Cir.2004)(noting no risk of endorsement under the Establishment Clause where the religious activities are not school-sponsored events). Indeed, banning religious use of a school facility after hours, while permitting non-religious use, violates the free speech clause of the First Amendment. *See, e.g., Widmar,* 454 U.S. at 277[, 102 S.Ct. 269] (striking down state university regulation which allowed broad array of student groups to use university facilities, but denied religious groups from doing so.)

7. It also bears mentioning that there is no indication that the Historic Commission would not be receptive to requests to expand or renovate the existing facility, short of demolition. Indeed, two members of the Housing Commission noted as much during the March 14, 2002 meeting in which Canterbury House's permit was denied. *See* Ex. H to Pl.'s MSJ ("Commissioners Schmerl and Winerberg both stated that additions to the present building could certainly be considered.") The Court observes that expansion or renovation would appear to resolve at least some of Canterbury House's spacial constraints, especially when those options are used in conjunction with Canterbury House's second floor space. Although Canterbury House has provided evidence indicating that expansion/renovation would not rectify its spacial limitations with respect to *all* of its usage needs, there is no evidence indicating expansion/renovation would not solve *some* of them. (Ex. 2 to Defs.' MSJ at 12)(testimony offered by architect noting Canterbury House's current building is not "conducive to expansion" so as to meet all of Canterbury House's usage needs.)

offers meditation, prayer, and study groups for its members. (Canterbury House website, Ex. C to Pl.'s MSJ at 1.) The Court is not convinced that the lack of a *designated* meditation space or student lounge imposes a substantial burden on Canterbury House or its members.

Finally, although Canterbury House may incur additional financial burdens, such as rental expenses to accommodate its entire congregation on occasion, or if it seeks additional growth, such financial burdens are not "substantial" under the RLUIPA. *See Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston*, 250 F.Supp.2d 961, 986 (holding zoning ordinance that prohibited religious institution from conducting worship services in district where it owned land did not substantially burden plaintiff's free exercise, despite the fact that "the congregation is forced to spend a considerable amount of money to rent space where worship services may be held."); *Lakewood*, 699 F.2d at 307 (no infringement on religious exercise where plaintiff was not prevented from practicing its faith in other venues throughout the city, even though ordinance prohibited plaintiff from building church on land it owned.) Similarly, although Canterbury House complains that other suitable land in the vicinity is too costly, or that others outbid Canterbury House when such land becomes available, those burdens do not render the City's permit denial actionable under the RLUIPA. *See Lakewood*, 699 F.2d at 307 (although "[t]he lots available to the Congregation may not meet its budget or satisfy its tastes", the Free Exercise Clause "does not require the City to make all land or even the cheapest...land available to churches."); *Love Church, supra.*

Indeed, in a conceptually similar case, the United States District Court for the Northern District of Illinois upheld the city of Evanston's zoning ordinance which prohibited the plaintiff, Vineyard Christian Fellowship ("Vineyard"), from using its property for worship or prayer. *See Vineyard*, 250 F.Supp.2d at 984–92. In that case, Vineyard owned property in a district zoned for office and certain commercial or cultural uses, but did not include religious worship. Vineyard's attempts to amend the ordinance to permit it to use its facility as its worship site were unsuccessful. Thus, Vineyard was able to operate its facility as a cultural center, and thereby host concerts, large group meetings, educational events, and liturgical dance presentations, but was not permitted to use its property for worship services. (*Id.* at 971.) As a result, Vineyard was forced to rent space for worship in other Evanston locations for several years. Equally relevant, to the court's analysis was its acknowledgment that any "large congregation or worshiping community would have difficulty finding space in Evanston unless it were able to buy property from a dying congregation within the City", and that Vineyard made a "significant effort to find alternate properties" to no avail. Nevertheless, the district court found Evanston's ordinance did not violate Vineyard's exercise of religion under the RLUIPA. (*Id.* at 986–91.)

In so holding, the Illinois district court recognized that "Vineyard's evidence leaves no doubt that its inability to worship at the subject property has been costly and that the church would benefit from owning and administering the facility in which its congregation worships." (*Id.* at 987.) The Court concluded, however, that the case law—citing both Supreme Court jurisprudence and case law from various circuits, including the Sixth Circuit's holding in *Lakewood*—does not support a finding that such "monetary and logistical burdens" rise to the level of a "substantial burden" under the RLUIPA.

Likewise, this Court holds that the burdens imposed on Canterbury House are not "substantial" as defined by the Supreme Court, the Sixth Circuit, and other federal and state courts. The Court finds Canterbury House has not demonstrated that the Historic Commission's actions have substantially burdened its religious free exercise.

Although a few district courts have held otherwise [8], this Court considers its holding to be most consistent with Sixth Circuit and Supreme Court precedent. In fact, those cases are distinguishable from the case at bar.

In *Cottonwood*, after experiencing significant growth over a 20–year period, the church asserted that its facility was no longer adequate to handle the congregation's growing membership. In particular, Cottonwood claimed that its small facility prevented it from meeting as a single body, as its beliefs counseled. It therefore sought and was denied a conditional use permit from the city to construct a new church to accommodate its expanded membership. The district court for the Central District of California found the city's permit denial constituted a substantial burden on the church's religious exercise.

The Court's holding was based on multiple factors absent from the case at bar. First, the Court observed that there was "strong evidence" that the city's actions were "specifically aimed at discriminating against Cottonwood's religious uses." (*Id.* at 1224–25.) The court explained that the property on which Cottonwood sought to build its new facility had sat vacant for nearly a decade. After Cottonwood purchased the land, however, "the City became a bundle of activity" and proposed

multiple retail developments in its place. (*Id.*) Unlike these facts, in our case, there is no evidence from which one could construe that the Defendants' actions were motivated by a discriminatory animus. Rather, the record demonstrates that the City has continuously dealt with permit applications—regardless of their source—in the same manner.

In addition, the *Cottonwood* court noted that the question of a "substantial burden" was one of degree. (*Id.* at 1227.) The factual circumstances in Cottonwood vary dramatically from the scenario presented to this Court. Although both cases involve (a) churches that assert their beliefs require religious worship as a whole, and (b) the denial of permits which would allow the churches to construct new, expanded facilities, the similarities end there.

In *Cottonwood*, the district court confronted a situation where the Cottonwood church experienced massive growth over a 20–year period, and had extensively explored and exhausted its options before filing suit. Since its founding, Cottonwood's membership grew from approximately 50 adult members to over 4,000 adults and 1,200 children. (*Id.* at 1211–12.) Given its spacial constraints, Cottonwood held six worship services each weekend to accommodate its growth in membership. (*Id.*) In addition, Cottonwood bused people to its church from off-site parking areas due to insufficient on-site parking. (*Id.*) Finally, Cottonwood spent approximately five years searching for new property to accommodate its parish, and another three years to obtain zoning approval. That approval was ultimately denied, and led to Cottonwood's lawsuit.

---

8. *See Westchester,* 280 F.Supp.2d at 240–42 (finding substantial burden where city denied permit to construct new church building despite the fact that plaintiff's existing facilities were antiquated and inadequate to fulfill its religious activities.); *Cottonwood,* 218 F.Supp.2d at 1226–27 (C.D.Cal.2002)(holding substantial burden where city denied conditional use permit to construct church building).

In this case, Canterbury House has stated that its present facility seats approximately 100 people, and that it needs to accommodate approximately 120. Accommodating 120 members, however, is a far cry from the 5,200 members the church sought to accommodate in *Cottonwood.* (*Id.* at 1227.)(implying the voluminous number of people burdened played a role in its conclusion that the Cottonwood church was substantially burdened.) Equally important, the difference between Canterbury House's current capacity and its alleged needed capacity—or 20 people—is not a significant number. It certainly appears that such a small number may be accommodated through renovations to Canterbury House's existing structure, rather than demolition.

Along these lines, the instant case also differs from *Cottonwood* in that there is no indication that Canterbury House thoroughly explored its options, or maximized the space in its current facility, prior to alleging a substantial burden [9]. As discussed above, Canterbury House has not explained why the second floor space currently leased to commercial tenants could not be used for its own religious needs. Nor has Canterbury House explained why additions or renovations short of demolition are insufficient alternatives (especially if coupled with its second floor space). Finally, there is no indication that Canterbury House cannot lease or sublease another facility, such as a university building, to accommodate its 100–120 member congregation, as needed. In sum, unlike the facts in *Cottonwood,* in this case, Canterbury House's claim of a substantial burden rings hollow given the multitude of unexplored alternatives available.

Likewise, the facts of *Westchester* differ from the instant case. The *Westchester* court found a substantial burden where the city denied the plaintiffs' permit application to construct a new building, in addition to making extensive renovations on its existing facilities. Importantly, the court held the city's *complete* denial of plaintiff's application constituted a substantial burden on their religious free exercise. *Westchester,* 280 F.Supp.2d at 240, 243. The denial of the *Westchester* plaintiffs' application in its entirety effectively constituted an outright ban on any modifications, improvements, or construction that the plaintiffs sought to undertake. That denial was also suspicious given the city's initial approval of plaintiffs' application, and then abrupt reversal in reaction to a "public outcry." (*Id.* at 243.)

In this case, the Defendants' permit denial in no way precludes Canterbury House from exploring other options short of demolition. Nor is there any evidence that animus played a role in the Defendants' conduct.

---

**9.** It bears mentioning that, according to Canterbury House, multiple masses will not fulfill its religious need to worship as a whole. Canterbury House contends that its religious mission may only be achieved if its entire congregation can worship during a single mass. Thus, although *Cottonwood* was extensively relied upon by Canterbury House in its motion for summary judgment and at oral argument, Canterbury House's position diverges from that advanced in *Cottonwood.*

In the latter, despite asserting that its beliefs counsel worship as a whole, the Cottonwood church held six masses to accommodate its parish. Canterbury House refuses to consider the alternative of holding a second service either before or after its Sunday, 5:00 p.m. "Jazz Mass". According to Canterbury House, its religious mission may only be satisfied if its entire congregation is present at one mass each week. Canterbury House's argument, taken to its logical conclusion, would mean that each time Canterbury House's Jazz Mass attendance exceeds its building's capacity, it must be permitted to demolish and reconstruct its facility, for any denial would constitute a substantial burden.

Given the factual differences between this case, *Cottonwood*, and *Westchester*, the Court is not persuaded that those cases lead to a different conclusion than that reached above. Accordingly, consistent with its findings above, the Court finds the Defendants' denial of Canterbury House's application does not constitute a substantial burden on its religious exercise.

In sum, even accepting as true the burdens alleged by Canterbury House, and viewing them in a light most favorable to it, those burdens do not substantially burden Plaintiff's free exercise. The denial of Canterbury House's permit application to demolish its existing facility does not force Canterbury House to choose between pursuing its religious beliefs and incurring criminal penalties or forgoing government benefits. Nor does the City's denial itself prevent Canterbury House from engaging in religious worship, or other religious activities. It merely prevents Canterbury House from engaging in one aspect of its faith—worship as a whole—at one time per week at its West Huron facility. Even that statement is speculative given Canterbury House's admission that it only exceeds its current capacity "at times". (Pl.'s MSJ at 4.)

In addition, the record reveals that Canterbury House's spacial constraints are not as dire as it alleges. Canterbury House admits: (a) that it currently provides certain services (i.e., meditation, concerts, etc.) at its current facility, and (b) that *one half* of its current space is leased to commercial tenants.

Finally, any financial burden imposed on Canterbury House to locate alternative property—rental or otherwise—does not rise to the level needed to prevail on its RLUIPA claim. The fact that alternative suitable properties may exceed Canterbury's budget, or that it may incur additional rental expenses to facilitate its religious mission, are not the type of severe burdens on one's religious free exercise that the RLUIPA seeks to protect. Accordingly, the Court finds summary judgment is appropriate in favor of the Defendants on Plaintiff's RLUIPA claim [10].

## SUMMARY

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment.

SO ORDERED.

---

10. Because the case may be resolved on statutory grounds, the Court need not reach the constitutional issues addressed by the Defendants.