475 F.Supp.2d 671 (2007)
Amos BEECHY, Alvin Slabaugh, Daniel Mast, John Mast, Amos Weaver, and All Similarly Situated Amish Persons, Plaintiffs,
v.
CENTRAL MICHIGAN DISTRICT HEALTH DEPARTMENT, Central Michigan District Board of Appeals, Mary Kushion, Michelle Patton, Robert Patton, John Doe Individuals 1-10, Doe Governmental Entities 1-10, Doe Partnerships, Corporations, Fiduciaries, or Other Entities 1-10, Defendants.
No. 03-10312.
United States District Court, E.D. Michigan, Southern Division.
February 20, 2007.
*672 Howard Van Den Heuvel, Rutherford Instutute, Grand Rapids, MI, for Plaintiffs.
Christopher K. Cooke, Cummings, McClorey, Williamsburg, MI, for Defendants.
OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION IN LIMINE
LAWSON, District Judge.
The primary issue in this civil rights case is whether a public health ordinance that prescribes the capacity of a septic tank that must be installed on residential property impinges upon the religious freedom of the plaintiffs, who are practitioners of the Old Order Amish faith, and who allege that the minimum capacity required by the law far exceeds that which they would need given their lifestyle. The defendants have moved for summary judgment contending that the record fails to establish that the tank requirement burdens religious practice because the plaintiffs have not shown that the requirement is intertwined with their faith such that First Amendment protection applies or that the requirement does anything more than present secular cost consideration. If the plaintiffs' objection to the tank regulation is based on a sincerely-held religious belief, then the defendants must come forward with evidence to show that the State's interest in sanitation and environmental protection is "of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause," Wisconsin v. Yoder, 406 U.S. 205, 214, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), for it is beyond this Court's power, authority, or competence to reconcile the Amish faith principles with the commands of the State's ordinance, or to determine whether the plaintiffs' beliefs fit neatly within Amish doctrine. However, if the uncontested evidence establishes that the plaintiffs' resistance to installing larger capacity septic tanks finds its source in non-religious reasons  such as cost or convenience  then the defendants will prevail on their motion, *673 for there are no interests to balance and the defendants plainly have the authority to regulate the treatment of human waste under the general police power. Oral argument was heard on the motion on August 2, 2006 and the matter was taken under advisement. The Court now finds that the uncontested facts, established mainly by the plaintiffs' own testimony, demonstrate that the objection to a 750-gallon septic tank and the preference for a 300-gallon tank are based on secular, not religious concerns. The Court, therefore, will grant the defendants' motion for summary judgment and dismiss the case.

I.
The plaintiffs allege in the complaint that they each applied for building permits from the Gladwin County, Michigan building department, presumably to build residential structures on land that they owned in the county. One of the requirements for issuance of such permits is compliance with the sanitation code promulgated by the Central Michigan District Health Department (CMDHD), which is an agency consisting of six member counties: Arenec, Claire, Gladwin, Isabella, Oceola, and Roscommon. At issue in this case is a requirement by CMDHD that a 750-gallon septic tank be installed on permitted property owned by the plaintiffs.
Each of the plaintiffs is a practitioner of the Old Order Amish faith. They describe minimalism and frugality as basic tenets of their faith, which cause them to avoid modern ways and conveniences including indoor plumbing, electricity, and running water. According to the plaintiffs, their lifestyles would not cause them to generate enough wastewater so as to require a septic tank on residential property as large as 750 gallons, and having a tank with such excess capacity would create a temptation for them to adopt more worldly ways.
According to the defendants, the 750-gallon requirement is the product of an agreement reached between the Amish in Gladwin County and the CMDHD in the early 1990s to accommodate their religious practices. Other residences in the county are required to maintain a septic tank of a size based on a formula of 250 gallons per bedroom. Under that rule, for the non-Amish, a five bedroom house of the size proposed by the plaintiffs would require a septic tank with a capacity of 1250 gallons. The defendants therefore maintain that the 750-gallon septic tank requirement already represents an exception to sanitary code.
The defendants claim that their effort to enforce the provisions of the agreement were frustrated by the plaintiffs, ultimately leading to the plaintiffs' criminal prosecution when the plaintiffs built their structures and occupied them without complying with the tank requirement. The plaintiffs eventually were prosecuted in the state district court and pleaded no contest to violations of the sanitary code. On January 31, 2002, sentencing was stayed to permit the plaintiffs to seek variances from the county based on their claim that the Amish faith prevented them from generating the amount of wastewater necessitating a 750-gallon tank.
The plaintiffs applied jointly for a variance to the sanitary code on May 9, 2002. The essence of the application was that the CMDHD should excuse the applicants from the obligation to comply with septic tank requirements of the health code and substitute in its place a "simple system" with design criteria suggested by Robert A. Hayes, a consulting engineer apparently hired by the plaintiffs, who furnished a nine-page report attached to the variance application. Defs.' Mot. Summ. J. Ex. 5, Variance Request. Mr. Hayes's report *674 concluded that the variance was appropriate because the plaintiffs, as practitioners of the Amish faith, used substantially less wastewater than the average American. Id. at Hayes Report, p. 9. The report stated that "the Old Order Amish in the community do not have the common high water use fixtures in their home (such as, flush toilets, showers, a dishwasher, or garbage disposal), compared to the typical non-Amish family." Id. at 2. Hayes estimated, "Amish families use 6.5% . . . or less, of the average gallons [of water used by non-Amish per day]," and in Gladwin, the Amish used on average three gallons per day per person. Id. at 3. Therefore, Hayes concluded, the 750-gallon tank requirement, which itself was an arbitrary one-half of volume reduction from the existing code for non-Amish households, "does not approach the actual wastewater volume . . . generated in a typical Old Order Amish residence." Id. at 2. He reached that conclusion based on logs he had asked his clients to keep that recorded their daily water use "over several months." Id. at 2.
The report posits that the wastewater generated by Amish families can be characterized as grey water, not black water, because their use of privies prevents human waste and solids from garbage disposals from entering the discarded water. Therefore, Hayes suggested, the septic systems for the Amish "should be designed based upon the actual volume and quality of wastewater generated." Ibid. The health code could be satisfied by a system that keeps wastewater "subsurface, but [allows] the low volume of gray water [to] be dispersed into the soil utilizing systems that are much smaller than called for by the code." Id. at 2-3. The report concluded that the following variances would substantially comply with the code:
We propose that the Old Order Amish be allowed to install or construct any of the following conceptual design septic tanks (which include extra capacity as an additional safety factor):
1. A minimum of 300-gallon pre-fabricated septic tank with discharge to a perforated tile/soil absorption systems as described below, or
2. Poured-Concrete/Concrete-block septic tank with baffles and a capacity of at least 300 gallons, with discharge to a perforated tile/soil absorption system as described below.
Id. at 7.
For new construction, the absorption system would require "at least two trenches with perforated tiles and the bottom of the system will be isolated from the water table or lower clay by at least two feet." Id. at 8. Within those parameters, the report stated, the Amish "may construct any new system with generally accepted septic tank/absorption system design practice but with the dimensions modified according to the hydraulic loading and the water quality of the gray water." Ibid. For existing construction "where the existing septic tanks and tile fields are sufficiently operating but do not meet the above specifications," Hayes proposed that "the system will be considered conforming and allowed to operate as long as they do not fail." Ibid. In the event that the existing system fails, the report states that the owner would have to upgrade the system.
The report concluded that the requested variance would pose "[n]o substantial health problems or nuisance," help eliminate "unnecessary or unreasonable hardship imposed by strict compliance with code," provide "[e]quivalent protection in the public interest," and would mean "[n]o violation of state statute or other applicable law." Id. at 9.
On May 15, 2002, the health department wrote that it was unable to proceed with the variance request because of some "diserepancies" *675 in Hayes's proposal. However, the environmental health supervisor stated that the issues might be resolved with further discussion and information, noting:
We have received your recent variance request for Mr. Weaver, Mr. Mast, Mr. Beechy, and Mr. Slabaugh. A preliminary review has been completed of this variance request and we are unable to proceed further with the variance due to a few discrepancies in the actual proposal. We are encouraged that your clients are attempting to make some sort of resolution to these situations and we feel that a meeting between the consulting firm . . . and this department may be able to iron out those discrepancies.
Defs.' Mot. Summ. J. Ex. 6, Letter (May 15, 2002). The letter proposed dates for a meeting with counsel for the plaintiffs, the prosecutor, and the health department to discuss the variance.
Despite the encouraging language of the May 15, 2002 letter, the health department denied the plaintiffs' request for a variance on July 19, 2002. Scott Jones, environmental health supervisor with the department, wrote to Amos Weaver that the request was denied but his letter contained no explanation. It did outline the applicant's appeal rights, however. Defs.' Mot. Summ. J. Ex. 5, Denial Letter (July 19, 2002).
Plaintiff Amos Weaver timely appealed the department's determination on August 17, 2002. In his appeal, Weaver explained:
The Amish have a unique, simple lifestyle which is environmentally sound. The standards put forth in the code are tailored to a non-Amish lifestyle; however, the code does recognize alternate systems and needs. The older order Amish have been practicing an alternate way of life for over three hundred years, and this proposed system meets and exceeds all requirements of the code and therefore should be implemented.
Defs.' Mot. Summ. J. Ex. 7, Appeal (Aug. 17, 2002). The decision to deny the variance was upheld by the Central Michigan District Board of Appeals on October 10, 2002 in a letter that, once again, contained to explanation. See Defs.' Mot. Summ. J. Ex. 8, Decision on Appeal (Oct. 10, 2002) (stating only that "[a]fter careful consideration, the . . . Board . . . at their September 25, 2002 meeting, moved to deny the variance requests for Amos Weaver, Enos Bontrager, John & Ida Mast, John E. Mast, Amos Beechy and Alvin Slabaugh all in Gladwin, Michigan").
The plaintiffs then commenced an action in the Gladwin County, Michigan circuit court for review of the administrative decision. The record does not disclose whether the state court proceedings were pursued to a conclusion before the commencement of the present action.
During the pendency of the lawsuit in state court, the plaintiffs commenced an action in the United States District Court for the Western District of Michigan on September 15, 2003. They allege violation of the Free Exercise Clause of the United States Constitution, Amendment I, and the Michigan Constitution, Article I, § 4 (Count I); violation of the Equal Protection Clause of the United States Constitution, Amendment XIV, and the Michigan Constitution, Article I, § 2 (Count II); violation of the Due Process Clause of the United States Constitution, Amendment XIV, and the Michigan Constitution, Article I, § 17 (Count III); and a violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, et seq. (Count IV). The matter was transferred to this Court on December 15, 2003.
During discovery the depositions of the plaintiffs were taken. It appears that some of the plaintiffs have sold their property *676 since the commencement of this lawsuit. Nonetheless, the defendants queried each of the plaintiffs as to the reasons they sought permission to install a 300-gallon septic tank instead of the 750-gallon tank that would have complied with CMDHD's health code. Plaintiff Amos Beechy testified at his deposition that the cost of a larger septic tank presented a hardship to him:
Q. All right. What unnecessary hardship, if any, did the health department's actions cause on you personally?
A. Well, most of it is, like, we come out and we don't get our own money until we're 21. Then we start working for ourselves and we don't have much money. And if we come in there and put a big old septic system in here, it's going to cost us a lot of money for the guy to come in her and dig it out, buy the tank, put the tank in. And it costs like, 4-or $5,000 and we can't afford it. I mean  and we feel it's a waste to do that. It's a waste of money to put a big old system in there like that.
Defs.' Mot. Summ. J. Ex. 10, Amos Beechy dep. at 34. Daniel Mast testified that he thought the 300-gallon tank proposal was a more workable system. He explained that a "300-gallon tank would be  just be better because it wouldn't take as much work." Defs.' Mot. Summ. J. Ex. 14, Daniel Mast dep. at 34.
Plaintiff Amos Weaver, whom the defendants believe is the spokesperson of the group, testified somewhat equivocally that both cost and religion play a role in the plaintiffs' objection to the 750-gallon tank requirement:
Q. All right. I'm going back to a comment you made when we were talking about the size of the well. There  actually it was on a mistreatment question. You said that you believe that the Amish were being mistreated because "they're making us put in a big septic tank and it is a temptation to the world." What does temptation  what did you mean by that "temptation to the world"?
A. Temptation means that we could put in bathrooms and that's against our ordinance to have something like that.
Q. Do you mean to suggest that if you were  or did put in a 750-gallon tank then the next thing that might happen is you put in bathrooms.
A. Yes.
Q. But that would be your choice to put in a bathroom?
A. No, it's not  that is not our choice, it's our ordinance.
Q. But you wouldn't do that; right?
A. Well, we've got an ordinance?
A. Well, you wouldn't violate the ordinance?
A. No.
Q. If it says you can't have bathrooms you wouldn't put a bathroom in; right?
A. No.
Q. And, in fact, there was a bathroom in this house that you took out?
A. Yes.
Q. In your mind, what is the hardship between putting in a 300-gallon septic tank and a 750-gallon tank?
. . . . .
A. Well, we could make that our own.
Q. You could make a 300-gallon tank yourself?
A. Yeah.
Q. How would you do that?

*677 A. Pour it with concrete or right here is a variance that we could lay it up with cement block.
Q. But you can also do the same for 750-gallon tank, couldn't you?
A. Yeah, but it'd be a lot bigger.
Q. Okay. Do you know, would there be an additional cost for the 750-gallon tank as compared to the 300?
A. Yes.
Q. What would be the additional cost?
A. I don't know but I know it would be a lot more.
Q. Well, how much do you pay for your block?
A. I don't know. I haven't bought any.
Q. Have you ever built a septic tank before?
A. No.
. . . . .
Q. But as far as the  if another member of the northern Gladwin group wants to install a 300-gallon tank, you haven't determined what the cost differential would be between a 300 and a 750?
A. No.
Q. Or the difference in, say, for instance, time to build a 300 versus a 750? "
A. No.
Defs.' Mot. Summ. J. Ex. 2, Amos Weaver dep. at 82-85
For his part, plaintiff Alvin Slabaugh suggested that he felt compelled to go along with the others in joining the lawsuit. Apparently, when Michael Kraut, a health department official, proposed an alternative system of waste management to bring Slabaugh into compliance with the health code, Slabaugh rejected the proposal "[b]ecause of this case we had going. I didn't feel it was right for me to do it if some of them didn't do it. We all belong to the same religion so I thought we should stick together." Defs.' Mot. Summ. J. Ex. 16, Alvin Slabaugh dep. at 34. He also believed that the variance "would be a lot simpler and a lot cheaper than what the health department requires." Slabaugh dep. at 44. Finally, when asked whether there was "[a]nything else [other] than the difference in cost between the two systems that's an unnecessary hardship," Slabaugh responded "[n]o." Id. at 53.
These depositions were taken in October 2004. The plaintiffs included their affidavits signed in April 2006 as part of their response to the defendants' motion for summary judgment. Plaintiffs Amos Beechy, Daniel Mast, Alvin Slabaugh, and Amos Weaver, plus Eli Beechy, one of the Amish bishops, all explain their rationale for seeking the variance in similar terms. The affidavits all explain that the plaintiffs owned property in Gladwin County and sought a variance from the 750-gallon septic tank requirement. They then recite:
I requested this variance because of my religious beliefs of minimalism and frugality that prevents [sic] me from generating the volume waste water [sic] that would require a 750 gallon tank. The core of this religious principle or ordung [sic] is that having appliances or devices would constitute a temptation to worldly things.
Pls.' Resp. Br. Ex. B, aff. of Amos Beechy, Mast, Slabaugh, and Weaver. This language is identical in all of the plaintiffs' affidavits. Weaver's affidavit contains the additional comment that while he was working with counsel to resolve "this situation for the larger Amish community I have been told by the Health Department that `all Amish lie'." Pls.' Resp. Br. Ex. B, Weaver aff.
The defendants hired an expert on Amish faith, Dr. Donald Kraybill. Dr. Kraybill testified at his deposition that there is no evidence in the case that a 750-gallon *678 septic tank is prohibited by religious dictate of the Northern Gladwin Amish.
Q. Has there been any evidence in this case that you have reviewed that there is any Ordnung that speaks to  with the North Gladwin community, that speaks to the size of a septic system they should have?
A. I did not find any reference to that. And that's what I was looking for in the documents.
. . . . .
Q. In the depositions that you reviewed, did anyone reference any sort of an Ordnung that had been 
A. They did not.
Defs.' Mot. Summ. J. Ex. 23, Donald Kraybill dep. at 47-48. Kraybill also explained that the idea of waste being a sin did not appear to be a religious issue:
I don't find any reference to [the idea that waste is a sin] in any of the religious doctrine or religious teaching of the Amish. I think there's a cultural disposition to frugality, a general cultural disposition, but it's not a religious principle.
Id. at 55.
In a report authored by Kraybill and submitted as part of the defendants' papers, Kraybill wrote that "[a] difficult challenge in Amish life is to sort out religious issues from custom, personal belief, and culture." Defs.' Mot. Summ. J. Ex. 24, Kraybill Report at 11. He offered a set of seven factors he used to attempt to distinguish issues of culture from tenets of the Amish faith. The Court did not find them helpful in light of the Supreme Court jurisprudence that directs courts away from such determinations. However, Dr. Kraybill did explain that an Amish community's beliefs are laid down in the 18 articles in the Dordrecht Confession of Faith, and refined in each community by an ordinance, or Ordnung, which is determined and ratified by the congregation. He explained that a progressive form of correction is applied to violations of the Ordnung consisting of "a) a visit from a deacon or bishop, b) an expectation for a public confession in front of the church, c) a temporary six-week exclusion from church life, d) excommunication, and e) shunning (avoidance) of the ex-member by current members." Id. at 12.
The defendants also offered evidence of the divestiture of the property by some of the plaintiffs. They claim that both plaintiffs Amos Beechy and Daniel Mast have no standing to assert constitutional violations in this case because they have since sold their properties. Amos Beechy testified that he bought his property in 2001 at 4049 Hockaday Road in Gladwin County for $106,000. Defs.' Mot. Summ. J. Ex. 10, Amos Beechy dep. at 7. He stated that he was cited by the health department for failing to have a septic tank. Ibid. However, he claimed that the structure on the property was a workshop and no one lived there except for himself. Ibid. He later testified that the structure was "32 by 32," one story, and later his wife and child joined him to live there. Id. at 16-17. He confirmed there was no septic system on the premises, and gray water was "dumped . . . out on the lawn, [and] watered the grass." Id. at 18. In 2004, without installing a septic system, he sold the property to his brothers, Perry and Joe Beechy for $160,000.
According to the defendants' records, plaintiff Daniel Mast owned property at 3126 Shell Road in Gladwin County. On November 30, 2001, health inspector Kraut drove by Mast's property and observed a new house that had been built there. See Defs.' Mot. Summ. J. Ex. 12, Bontrager/Mast Chronology. He took pictures of the structure some days later and on December 12, 2001, based on his belief that a sanitary code violation had occurred, sent *679 a certified letter to Mast, the registered owner of the property. Mast wrote a letter to the health department in which he stated that he no longer owned the property.
In regards to the charges you are filing per the residence on 3126 Shell Rd. I Daniel Mast do no own the property. We sold it to our Daughter + Husband. As far as unapproved water supply, there is absolutely nothing wrong with the water supply. Frontier Well Drilling did all the work and it, the well, is over 300 ft. deep. As for sewage disposal we have been getting along fine with the system that is there.
P.S. It is not our property. What are you going to do now?
Defs.' Mot. Summ. J. Ex. 13, Letter (May 14, 2002).
As part of this litigation, the defendants' sanitation expert, Richard Farlardeau, conducted inspections of the plaintiffs' property. Fardarleau testified at his deposition that plaintiff Amos Weaver's septic tank was "overfilled, it was actually filled to a level that would be above the outlet pipe and up into the tank riser." Defs.' Mot. Summ. J. Ex. 20, Richard Fardarleau dep. at 103. The level of the tank, according to Fardarleau, meant "downstream of the tank the drainage tile is so full that sewage can't get out of the tank fast enough so it's backing up into the tank." Ibid. The system, Fardarleau concluded, "was close to failure." Id. at 104. Weaver apparently had a 500-gallon tank. Id. at 142. Farlardeau summarized his opinion as follows:
From a public health standpoint we have gray water being discharged to the ground surface not only at the Weaver residence but the other residences where we had a direct discharge into a pasture at Slabaughs or at the Beechy home we had them depositing all of their gray water right out their back door. And in addition to that, we have privies that basically were overflowing in a majority of cases where we have effluent from the privies going right onto the ground surface. And at the Glick residence [at one point owned by plaintiff Mast] it overflowed right into an area that was used for the clothes line. So we have this potential for people coming in contact with untreated waste water.
Id. at 144.
The defendants have submitted the names of several Amish individuals that apparently have agreed to or have followed the 750-gallon requirement. See Defs.' Mot. Summ. J. Ex. 25, List. The plaintiffs have objected to the mention of privies in the defendants paper and the list of individuals, previously mentioned.

II.
The central focus of the defendants' motion for summary judgment is a challenge to the plaintiffs' assertion that adherence to the sanitation ordinance would violate a genuinely held religious belief. That question confounds two fact issues that must be separated: the first is whether the plaintiffs' objections are based on religious beliefs; and the second is whether those beliefs are sincerely-held articles of their faith. Dr. Kraybill commented on both these issues. However, as will be explained more fully below, the first is subject to examination by the Court under traditional summary judgment criteria. The second is beyond the reach of the Court's authority to determine.
A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require *680 submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotes omitted).
A fact is "material" if its resolution affects the outcome of the lawsuit. Lenning v. Commercial Union Ins. Co., 260 F.3d 574, 581 (6th Cir.2001). "Materiality" is determined by the substantive law claim. Boyd v. Baeppler, 215 F.3d 594, 599 (6th Cir.2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." Henson v. Nat'l Aeronautics & Space Admin., 14 F.3d 1143, 1148 (6th Cir.1994) (quoting Anderson, 477 U.S. at 248, 106 S.Ct. 2505). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. St. Francis Health Care Ctr. v. Shalala, 205 F.3d 937, 943 (6th Cir.2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. Kraft v. United States, 991 F.2d 292, 296 (6th Cir. 1993); see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc., 190 F.3d 768, 772 (6th Cir.1999).
The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 848 (6th Cir.2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir.1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252, 106 S.Ct. 2505. If the nonmoving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. Celotex Corp., 477 U.S. at 322-23, 106 S.Ct. 2548.
The party who bears the burden of proof must present a jury question as to each element of the claim. Davis v. McCourt, 226 F.3d 506, 511 (6th Cir.2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. Elvis Presley Enters., Inc. v. Elvisly Yours, Inc., 936 F.2d 889, 895 (6th Cir.1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] `draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir.2003).
The four counts of the plaintiffs' complaint have as their common feature the allegation that the septic tank ordinance burdens their religious practices. If the plaintiffs cannot make out a Free Exercise Clause violation, they will not succeed on *681 their other counts. For instance, the plaintiffs' substantive due process claim merges with the First Amendment claim. Substantive due process protects against state action that is not otherwise proscribed by the plain text of other constitutional amendments and for which no adequate mechanism for deprivation can exist. See Ciminillo v. Streicher, 434 F.3d 461, 465 (6th Cir.2006) (reasoning that "[a]lleged conduct that does not implicate a constitutional right protected by another amendment will be analyzed under the substantive due process component of the Fourteenth Amendment"). However, the plaintiffs' substantive due process claim in this case merely restates their other constitutional claims at a higher level of abstraction. Where a plaintiff has recourse to an "explicit textual source of constitutional protection," Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), such as here with their Free Exercise Clause claim, a more general claim of substantive due process is not available. See County of Sacramento v. Lewis, 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).
Similarly, the Religious Land Use and Institutionalized Persons Act of 2000 states that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution  (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1)(A)(B). In determining whether religion is "substantially burdened," courts generally turn to Free Exercise Clause jurisprudence. See Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1226-27 (11th Cir.2004); Episcopal Student Foundation v. City of Ann Arbor, 341 F.Supp.2d 691 (E.D.Mich.2004). Absent a "substantial burden," no violation of the statute can be established.
The First Amendment, made applicable to the States through the Fourteenth Amendment, Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." "[The] purpose [of the Free Exercise Clause] is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority. Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." Sch. Dist. of Abington v. Schempp, 374 U.S. 203, 223, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); see also Mozert v. Hawkins County Bd. of Educ., 827 F.2d 1058, 1066 (6th Cir.1987) (stating that "[i]t is clear that governmental compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion, is the evil prohibited by the Free Exercise Clause").
Members of the Amish faith have called upon the protection of the Free Exercise Clause in the past to stave off the encroachment of modern society into their cultural and religious practices. See, e.g., Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). In Yoder, the Supreme Court considered whether Wisconsin's compulsory education statute, requiring schooling to age sixteen, interfered with the religious beliefs of members of the Amish Mennonite Church and the Old Order Amish. The case arose out of the criminal convictions of certain members *682 who refused to send their children to school past graduation from the eighth grade. The Amish argued that sending their children to high school was contrary to their religion and way of life. By sending their children to high school, they claimed, they would be exposed to a danger of censure in the church community and a danger to their chances of salvation. Expert witnesses testified in the lower court proceedings that the Amish views on education past the eighth grade were a central tenet of their religion, and the State's requirement of further education could threaten the existence of Amish communities. Among the Amish beliefs were a de-emphasis on "material success, [a] reject[ion] of the competitive spirit, and [a desire] to insulate themselves from the modern world." Id. at 210, 92 S.Ct. 1526. In other words, there was a "fundamental belief that salvation requires life in a church community separate and apart from the world and worldly influence." Ibid.
The State of Wisconsin stipulated that the religious beliefs of the Amish in that case were "sincere." Id. at 209, 92 S.Ct. 1526. The Court also acknowledged that neither the right to freely practice one's religious beliefs nor the State's interest in compulsory education were absolute; one must be balanced against the other. Id. at 214, 92 S.Ct. 1526 (noting that for the State to compel school attendance despite the respondents' religious claims, "it must appear either that the State does not deny the free exercise of religious belief by its requirement, or that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause"). However, the Court went at some length to distinguish religious beliefs from a way of life based on secular considerations, since the latter would not invoke the need to engage in balancing the rights of the parties. The Court stated:
In evaluating those claims we must be careful to determine whether the Amish religious faith and their mode of life are, as they claim, inseparable and interdependent. A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation . . . if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief. Although a determination of which is a `religious belief or practice entitled to constitutional protection may present a delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest a religious basis. Thoreau's choice was philosophical and personal rather than religious, and such a belief does not rise to the demands of the Religion Clauses.
Id. at 215-16, 92 S.Ct. 1526.
The Court then found the record "abundantly support[ed]" the assertion that the Amish views on compulsory education past the eighth grade have a religious basis. Id. at 216, 92 S.Ct. 1526. The Court observed that "the record so strongly shows [that] the values and programs of the modern secondary school are in sharp conflict with the fundamental mode of life mandated by the Amish religion," and secondary schooling "contravenes the basic religious tenets and practice of the Amish faith, both as to the parent and the child." Id. at 217-18, 92 S.Ct. 1526. The Court then found that the State's interest in universal compulsory secondary education to age *683 sixteen did not outweigh the Amish interest in avoiding the obligation "to perform acts undeniably at odds with fundamental tenets of their religious beliefs." Id. at 218, 92 S.Ct. 1526.
Although the Court in Yoder found it necessary to determine whether the Amish litigants' objection to compulsory education beyond eighth grade was based on religion or something else, the Court never had to ask whether the act of sending their children into the secular world violated a religious rule. In United States v. Lee, the Court made clear that such inquiry played no role in those determinations. Lee involved a religious-based challenge by an Amish employer to a law requiring payment of Social Security taxes. Lee, a practitioner of the Old Order Amish faith, contended that because there was a religiously-based obligation requiring members of his faith to provide for each other in the same manner contemplated by the social security system, participation in private and public social welfare programs is sinful. The government countered by arguing that paying social security taxes would not violate Amish religious beliefs. However, the Court shunned that argument:
It is not within "the judicial function and judicial competence," however, to determine whether appellee or the Government has the proper interpretation of the Amish faith; "[c]ourts are not arbiters of scriptural interpretation." Thomas v. Review Bd. of Indiana Employment Security Div., 450 U.S. 707, 716, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). We therefore accept appellee's contention that both payment and receipt of social security benefits is forbidden by the Amish faith . . . [and] compulsory participation in the social security system interferes with their free exercise rights.
Lee, 455 U.S. at 257, 102 S.Ct. 1051. The Court ultimately concluded that the government's interest in assuring mandatory contributions into the social security system and uniformity of enforcement overbalanced the Amish employer's rights under the religion clauses, noting that "every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs." Id. at 262, 102 S.Ct. 1051. But the Court did put the government to the task of demonstrating an overriding government interest.
The plaintiffs read Lee as prohibiting any inquiry into the reasons they object to the sanitation ordinance or assessment of whether their objections are reasonable. The Court believes that the plaintiffs misread the precedent and construe it much too broadly. Lee stands for the proposition that once established, the sincerity of one's religious belief cannot be questioned. Contrary to the plaintiffs' argument, Lee does not prohibit the Court from first determining, as it must according to Yoder, whether the belief exists and' whether it is based on grounds other than religion.
That inquiry is critical in this case, because nowhere in their affidavits or deposition testimony do the plaintiffs actually state that installation of a 750-gallon septic tank as required by the CMDHD health code violates their religion or interferes with the practice of their faith. In their depositions, Amos Beechy, Alvin Slabaugh, and Daniel Mast mentioned religion not at all when asked for the reasons they objected to installing a larger septic tank. They cited only considerations of cost and convenience. Alvin Slabaugh also stated that he believed that he should not depart from the position of the group because they "should stick together." Defs.' Mot. Summ. J. Ex. 16, Alvin Slabaugh dep. at *684 34. Amos Weaver testified that installing a larger tank might expose him to the temptation to violate the Amish rule of simplicity because a tank of that capacity would make it possible to install flush toilets, which would be a violation of the Ordnung. However, he never actually stated that installing the 750-gallon tank required by the health department itself would interfere with his religious practices.
When considering the plaintiffs' affidavits, the Court is mindful that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." Reid v. Sears, Roebuck & Co., 790 F.2d 453, 460 (6th Cir.1986). The rationale for this rule "is grounded on the sound proposition that a party should not be able to create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists." Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 907 (6th Cir. 2006). Nonetheless, a careful review of those affidavits discloses no statement that the tank installation trenches upon the Amish faith. Rather, the affiants all cite to their religious beliefs and practices as support only for their claim that they would not generate enough wastewater so as to need a 750-gallon tank. Accepted in the light most favorable to the plaintiffs, the affidavits prove that the CMDHD-required tank size is not needed by Amish families (and therefore the variance should be granted for practical reasons), but they do not state or imply that installation of the 750-gallon tank violates their Ordnung, contravenes a tenet of their faith, or interferes with the practice of their religion. Their religious beliefs, which dictate their lifestyle, are offered as explanations for why they do not need a larger tank, and nothing more.
The defendants have presented a list of five other Amish families in Gladwin County who have agreed to install 750-gallon septic tanks. Perhaps these plaintiffs are reluctant to take the stand that installing tanks of that size contravenes their religious beliefs so as to avoid condemning others in their community. The Court need not speculate on the reason, however; it is enough to observe that the plaintiffs never have plainly stated that the practice the defendants seek to compel  installing a 750-gallon septic tank for the deposition of wastewater on residential property  itself violates the tenets of the plaintiffs' faith. Absent that declaration, the Court is left with the undisputed facts put forth in the depositions, namely, that the plaintiffs' primary and sole objection to the tank ordinance  and the reason they sought the variances  was based on cost, convenience, and the practical fact that they just did not need to comply with the capacity requirements ordained by the defendants. The Court must conclude, therefore, that the defendants have not interfered with the plaintiffs' religious practices, the ordinance does not substantially burden the plaintiffs' exercise of their religious rights, and the defendants are entitled to a judgment as a matter of law on all counts of the plaintiffs' complaint.

III.
The Court finds that the uncontested facts, taken in the light most favorable to the plaintiffs, demonstrate that their objection to installing a septic tank of the size required by the CMDHD ordinance governing residential property is based on secular, not religious concerns. The plaintiffs have not come forward with evidence that establishes that the defendants have interfered with their religious practices. The defendants, therefore, are not called upon to offer a compelling reason justifying *685 the ordinance. The defendants are entitled to a judgment in their favor as a matter of law.
Accordingly, it is ORDERED that the defendants' motion for summary judgment [dkt# 72] is GRANTED.
It is further ORDERED that the plaintiff's motion in limine [dkt# 68] is DENIED as moot.
It is further ORDERED that the complaint is DISMISSED WITH PREJUDICE.