RENDERED: DECEMBER 18, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0006-DG

MISSIONARIES OF SAINT JOHN THE            APPELLANT
BAPTIST, INC.

|  | ON REVIEW FROM COURT OF APPEALS |
| :-- | :-- |
| v. | NO. 2022-CA-0867 |
|  | KENTON CIRCUIT COURT NO. 21-CI-00766 |

JOEL FREDERIC; CATHLEEN            APPELLEES
MATCHINGA; CHARLES MEYERS;
CITY OF PARK HILLS BOARD OF
ADJUSTMENT; ELIZABETH
FREDERIC; JUSTIN ODOR; MARK
KOENIG; ROBERT SWEET; SHEILA
BURKE TRUST; SHELIA BURKE, IN
HER CAPACITY AS TRUSTEE FOR
THE SHEILA BURKE TRUST; AND
THOMAS MICHAEL

## OPINION OF THE COURT BY CHIEF JUSTICE LAMBERT

## <u>AFFIRMING</u>

The Protection of Religious Exercise in Land Use and by Institutionalized Persons Act (RLUIPA) is a federal law enacted to protect individuals and religious institutions from substantially burdensome or discriminatory land use regulations and to protect the religious rights of institutionalized persons. In this case, this Court must address as a matter of first impression whether the enforcement of a zoning ordinance to deny a church the ability to build a religious shrine constituted a violation of RLUIPA. After review, we affirm the

Court of Appeals' ruling that RLUIPA was not violated under the facts of this case, although we do so on different grounds.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### a. Park Hills Board of Adjustment

In March 2021, Jordan Odor[1] submitted an application letter to Chris Schneider, the Principal Planner for the Planning and Development Services of Kenton County (PDS).[2] The letter was submitted by Odor on behalf of the Sheila Burke Trust (the Burke Trust) and Missionaries of Saint John the Baptist, Inc. (St. John). St. John is a non-profit organization that owns real property in Park Hills, upon which sits Our Lady of Lourdes, a diocesan Catholic church.

Odor's letter requested that the Park Hills Board of Adjustment (the Board) issue a conditional use permit and setback variances so that St. John could build an outdoor grotto into a small hill next to its parking lot. The grotto was to consist of a shrine to the Virgin Mary, a plaza, a walking path, and a retaining wall. St. John sought to build the 16 ft. by 39 ft. grotto on a portion of land adjacent to the church's lot that was then-subject to a perpetual lease agreement between the Burke Trust and St. John; the lease

---

[1] It appears that Odor is the architect that created or took part in creating renderings of the grotto, though it is unclear from the record.

[2] PDS is an area planning commission created pursuant to Kentucky Revised Statutes (KRS) 147.610 – 147.710. It provides planning and zoning services to the Park Hills Board of Adjustment and other governmental entities in Kenton and Campbell Counites within the meaning of KRS Chapters 100 and 147. PDS is not authorized to take any "final action" within the meaning of KRS 100.347 as it relates to the issuance of conditional use permits or variances.

was entered into with the mutually agreed intent to construct the grotto. St. John's property was located on Amsterdam Road, a collector street,[3] while the land owned by the Burke Trust on which the grotto would be built was on Alhambra Court, a local street.[4]

The Odor letter acknowledged that the church was already classified as a "conditional use" because it was zoned in a district for single and two-family residential buildings; the church was constructed prior to the adoption of the Park Hills zoning code and has been used as a church for various denominations ever since. The letter further acknowledged that "the creation of any type of accessory space to the existing church is not directly permitted by the current local zoning ordinance" because the ordinance required that churches be located adjacent to an arterial street[5] in order to obtain a conditional use permit. Specifically, Section 10.4 of the Park Hills zoning ordinance states, in relevant part:

A. PERMITTED USES:

 1. Single - family residential dwellings (detached).
 2. Two - family residential dwellings.
 3. Planned Unit Development (PUD), as regulated by
    ARTICLE XI of this Ordinance.

---

[3] Section 7.0 of the Park Hills' zoning code defines collector street as a "[p]ublic [thoroughfare] which [serves] to collect and distribute traffic, primarily from local residential streets to arterial streets."

[4] Section 7.0 of the Park Hills zoning code defines local street as "[f]acilities which are designed to be used primarily for direct access to abutting properties and leading into the collector street system."

[5] Section 7.0 of the Park Hills zoning code defines arterial street as "[p]ublic thoroughfares which serve the major movements of traffic within and through the community[.]"

3

. . .

C. CONDITIONAL USES: No building or occupancy permit shall be issued for any of the following, nor shall any of the following uses or any customary accessory buildings or uses be permitted until and unless the location of said use shall have been applied for and approved of by the Board of Adjustment, as set forth in SECTION 9.13:

. . .

2. Churches and other buildings for the purpose of religious worship, provided they are located adjacent to an arterial street.

Notwithstanding the plain language of the ordinance, Odor requested that the Board approve: "the installation of a customary accessory structure (i.e. grotto) to the existing conditional use for a place of religious worship"; "the installation of a customary accessory structure (i.e. grotto) at a site located off a collector street rather than an arterial street"; and "variances . . . for conditionally permitted uses[.]"  In addition to his letter, Odor submitted a site plan and drawings detailing the proposed grotto and several letters in support of the project from members of the community.

On April 8, 2021, Schneider sent the Board a one-page letter and five-page PDS staff report recommending that St. John's request for a conditional use permit and variances be denied.  PDS's recommendation was based on the proposed project's failure to satisfy the requirements of Section 10.4 of the zoning code which, as noted, permitted for conditional use "[c]hurches and other buildings for the purpose of religious worship, *provided they are located*

4

*adjacent to an arterial street.*"  (Emphasis added).  In addition, Section 9.13 of

the zoning code directs:

> A. The Board of Adjustment may authorize a conditional building
>    and use to be located within any zone in which the particular
>    conditional use is permitted by the use regulations of this
>    ordinance, *if the evidence presented by the applicant is such as
>    to establish, beyond any reasonable doubt*:
>
>    1. That the proposed building and use at the particular location
>       is necessary or desirable to provide a service or facility which
>       will contribute to the general well being of the neighborhood
>       or the community; and
>    2. That such building and use will not, under the
>       circumstances of the particular case, be detrimental to the
>       health, safety, or general welfare of persons residing or
>       working in the vicinity, or injurious to property or
>       improvements in the vicinity; and
>    3. *That the proposed building and use will comply with any
>       regulations and conditions specified in this ordinance for such
>       building and use.*

(Emphasis added).  While PDS believed that the proposed project satisfied

Section 9.13(A)1. and 2., it could not conclude that subsection 3.'s requirement

had been met because "[c]hurches are required to [be] located adjacent to an

arterial street[,]" and "Amsterdam Road is a collector street[.]"  It advised the

Board that being located on an arterial street was "a minimum requirement of

the zoning ordinance for conditional use."

As PDS recommended that the conditional use permit be denied, it

further recommended that the variances be denied.  However, it noted that if

the Board wished to grant the variances, it must first find that granting the

variances "will not adversely affect the public health, safety or welfare, will not

alter the essential character of the general vicinity, will not cause a hazard or a

5

nuisance to the public, and will not allow an unreasonable circumvention of the requirements of the zoning regulations." KRS 100.243(1).

On April 15, 2021, the Board held a public hearing regarding St. John's requests. Schneider gave a presentation and explained PDS's position that the requests should be denied consistent with the reasons provided in the PDS

staff report. Father Sean Kopczynski presented his own presentation on behalf of St. John. When the hearing was opened to the public several members of the community voiced support for the project while several, including Joel Frederic, voiced their opposition. The most common reason raised in opposition was that traffic and parking in the neighborhood, which were already a problem, would be exacerbated.

The Board voted 4-1 to grant both the conditional use permit and the setback variances conditioned on the property being deeded to St. John's within six months.[6] The sole member that voted against granting St. John's requests did so on the basis that the church was not located on an arterial street and concerns about increased traffic.

Four days after the public hearing, Schneider sent Odor, St. John, and the Burke Trust a barebones letter memorializing the Board's decision to grant

---

[6] During the hearing the Board's chairman expressed that he would be "much more comfortable" if the property was deeded to St. John "to eliminate a lot of controversy about what if." Father Kopczynski stated that the Burke Trust intended to transfer the property in fee simple to St. John regardless of whether the project was approved and that they had already begun that process. The property was ultimately deeded to St. John on June 22, 2021.

6

the conditional use permit and variances. The Board's findings were, in their

entirety:

**Request 1**
**Decision:** To approve the conditional use permit for an accessory structure associated with a church.

**Basis:** 1. The proposed building and use at this particular location is necessary or desirable to provide a service or facility which will contribute to the general well being of the neighborhood or the community.
2. The proposed building and use will not, under the circumstances of this particular case, be detrimental to the health, safety, or general welfare of persons residing or working in the vicinity, or injurious to property or improvements in the vicinity.
3. *The proposed building and use will comply with any regulations and conditions specified in this ordinance for such building or use.*
4. Based on testimony heard at the April 15, 2021 public hearing.

**Request 2**
**Decision:** To approve the variance requests to the rear and side yard setback requirements for an accessory use associated with a church with the condition that the portion of 917 Alhambra Court which contains the proposed accessory structure. . . is deeded over to 1101 Amsterdam Road within six months.

**Basis:** 1. The requested variances will not adversely affect the public health, safety [or] welfare, will not alter the essential character of the general vicinity, will not cause a hazard or nuisance to the public, and will not allow an unreasonable circumvention of the zoning regulations.
2. Based on testimony heard at the April 15, 2021 public hearing.

(Emphasis added).

7

### b. Kenton Circuit Court

Thereafter, Joel Frederic and his wife Elizabeth, who live directly across the street from the church, filed a complaint against the Board; Odor; the Burke Trust; Shelia Burke, as trustee of the Burke Trust; and St. John (collectively, the defendants)[7] in Kenton Circuit Court. We note here that any recorded proceedings that may have occurred before the circuit court were not included in the record now before us.

Count one of the complaint was an appeal pursuant to KRS 100.347 under which the Frederics asserted that the Board violated the applicable ordinances in granting St. John's conditional use permit because the church's property was not adjacent to an arterial street. It further contended that the Board lacked the authority to grant variances to St. John pursuant to KRS 100.247 ("The board shall not possess the power to grant a variance . . . which is not permitted by the zoning regulation in the zone in question[.]"), and that the Board failed to consider that the expansion of a nonconforming use was implicated under KRS 100.253 ("The board of adjustment shall not allow the enlargement or extension of a nonconforming use beyond the scope and area of its operation at the time the regulation which makes its use nonconforming was adopted[.]"). Count two of the complaint sought declaratory and injunctive relief.

---

[7] The complaint also named PDS as a defendant, but it was later dismissed from the suit by agreed order as it was an unnecessary party.

The defendants filed a joint answer to the complaint asserting various defenses. Pertinent to our purposes herein, the defendants' answer did not assert that the Board was compelled to grant St. John's request under RLUIPA, 42 U.S.C.A.[8] §§ 2000cc – 2000cc-5.

Roughly nine months later, the Frederics filed a motion for summary judgment which asserted identical arguments to those raised in their complaint. The defendants thereafter filed their own joint motion for summary judgment. Despite their initial acknowledgement before the Board that the church was not located on an arterial street, their motion for summary judgment changed course. They instead noted that the construction of the church pre-dated the zoning code and asserted, without any supporting evidence, that at the time the church was constructed Amsterdam Road was an arterial street. Based on this they argued, without any supporting case law or statutes, that an existing structure within a zone is not affected by subsequent zoning changes and are therefore "grandfathered in" until the existing use is abandoned. They further argued, again without any supporting law, "that since the church predated the zoning regulations it is exempt from the current restrictions." Or, stated differently, the zoning code simply did not apply to it.

The defendants further argued, for the first time, that RLUIPA applied. Their only argument was that there was no compelling reason to prevent the grotto's construction and that the issue was "beyond the scope of government

---

[8] United States Code Annotated.

9

regulation." The motion for summary judgment also asserted that the Board did not act arbitrarily in granting the conditional use permit or variances; that the Frederics failed to show they were aggrieved or injured by the Board's ruling; and that the circuit court lacked the authority to grant the Frederics' requested injunctive relief.

The Frederics' reply did not assert that the defendants were precluded from raising RLUIPA due to their failure to assert it as an affirmative defense in their answer to the Frederics' complaint. Instead, they responded to the argument on the merits and asserted that the zoning ordinance was a reasonable restriction that keeps traffic from churches to arterial streets in order to prevent non-arterial neighborhood streets from being overburdened, and thus that enforcement of the ordinance did not violate RLUIPA. As for the church's existence pre-dating the zoning code, the Frederics argued that this simply made the church a non-conforming use which may be continued but cannot be expanded. KRS 100.253. They further argued that they had asserted an actual injury; that they were denied due process by the Board because they were not permitted to cross-examine anyone during the public hearing; and that injunctive relief could be issued to prevent the government from violating the law.

The circuit court granted summary judgment in favor of the defendants. It is not clear from the record whether the circuit court held a hearing on the competing motions for summary judgment, or whether it issued its ruling based solely on the parties' filings. While the court found that the Frederics

10

had standing and had alleged an actual injury, it further found that they failed to demonstrate the Board acted arbitrarily pursuant to *Am. Beauty Homes Corp. v. Louisville & Jefferson Cty. Planning and Zoning Comm'n*, 379 S.W.2d 450 (Ky. 1964). *American Beauty* provides a tripart test to determine whether an administrative body acted arbitrarily, namely: whether the body acted in excess of its granted powers, whether the litigants before the body were afforded procedural due process, and whether the body's decision was supported by substantial evidence. *Id.* at 456. First, regarding whether the Board acted in excess of its powers, the circuit court found:

> The church building has existed on the property since 1930, at which time Amsterdam Road was an arterial street. Amsterdam Road was reconstructed and right-of-way acquired by the Commonwealth Department of Highways in 1955 but the road was never officially designated as being in the State Primary Road
>
> System. Park Hills zoning ordinance adopted in 1974 provides in § 10.4 that churches are permitted in the relevant zone provided they are adjacent to an arterial street, which is defined in § 7.0 as a public thoroughfare which serves the major movements of traffic within and through the community as identified in the comprehensive plan for the city. The right-of-way was transferred from the state back to the City of Park Hills, for that portion of the road within the city limits, in 2007. The Missionaries of St. John the Baptist obtained the property in 2015. At some point it appears that Amsterdam Road lost its designation as an arterial street, although it still meets that definition, but the church is grandfathered in as an accepted conditional use and any permits for accessory structures or variances are to be considered accordingly. *Wells v. Fiscal Court of Jefferson County*, 457 S.W.2d 498, 502 (Ky. 1970).[9]

---

[9] *Wells* upheld a decision of the Jefferson County Fiscal Court to re-zone a parcel of land from single-family residential to multi-family residential under KRS 100.213 and held that a parking garage was a valid accessory structure for the proposed apartment buildings. *Id.* at 502-03. It said nothing regarding the concept of "grandfathering in."

11

It further held that the Board provided procedural due process via the public hearing and that substantial evidence supported its decision. The circuit court ruled in the defendants' favor, and it did not address RLUIPA.

### c. Court of Appeals

The Frederics appealed the circuit court's ruling to the Court of Appeals, and a unanimous panel reversed. *Frederic v. City of Park Hills Bd. of Adjustment*, 2022-CA-0867-MR, 2023 WL 8286391 (Ky. App. Dec. 1, 2023). The court held that the Board acted arbitrarily under the *American Beauty* test because while it afforded the Frederics procedural due process, *id.* at *6, it exceeded its statutory authority in granting St. John a conditional use permit and variances. *Id.* at *4. It reasoned that the construction of the grotto on the Burke Trust property "would constitute either a change or an expansion of the church's preexisting nonconforming use[,]" and that the expansion of a preexisting nonconforming use is plainly prohibited by Section 19.6(D)(3) of the zoning code, which states: "The Board of Adjustment shall not allow the enlargement or extension of a nonconforming use beyond the scope and area of its operation at which time its use became nonconforming." *Id.* It further held that KRS 100.253 likewise prohibited the expansion. *Id.* Based on this holding, the court declined to address whether the Board's decision was supported by substantial evidence. *Id.* at *6.

As for RLUIPA, we first highlight that neither the Frederics' appellant brief nor its reply brief before the Court of Appeals argued that the RLUIPA

12

claim was not properly before the court due to the defendants' failure to assert it affirmatively in their answer before the circuit court, and instead argued the issue on the merits at the summary judgment phase. The Court of Appeals accordingly addressed the defendants' RLUIPA claim and held:

> [T]he Sixth Circuit notes, there is "no substantial burden when, although the action encumber[s] the practice of religion, it d[oes] not pressure the individual to violate his or her religious beliefs." *Living Water Church of God v. Charter Tp. of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007)
>
> "RLUIPA's history demonstrates that Congress intended to leave intact the traditional 'substantial burden' test, as defined by the Supreme Court's free exercise jurisprudence." *Episcopal Student Found. v. City of Ann Arbor*, 341 F. Supp. 2d 691, 701 (E.D. Mich. 2004) (citations omitted). Federal courts have identified two categories of alleged substantial burden upon free exercise of religion. *Id.* at 701. As to the first, "courts routinely find substantial burdens where compliance with the statute itself violates the individual's religious beliefs and noncompliance may subject him to criminal sanctions or the loss of a significant government privilege or benefit." *Id.* at 701-02. In the second,
>
> "courts have been far more reluctant to find a violation where compliance with the challenged regulation makes the practice of one's religion more difficult or expensive, but the regulation is not inherently inconsistent with the litigant's beliefs." *Id.* at 702.
>
> The Park Hills Zoning Ordinance falls squarely within the second category. The application of the ordinance to prohibit construction of the grotto may make practice of religion somewhat more difficult for the church's congregation or the adherents of the Catholic faith broadly, but the Zoning Ordinance is not inherently inconsistent with their religious beliefs.

*Id.* at *6-*7 (internal citations omitted). The Court of Appeals accordingly concluded that enforcement of the Park Hills zoning ordinance did not constitute a violation of RLUIPA. *Id.* at *7.

13

St. John thereafter sought discretionary review of the Court of Appeals' ruling from this Court, which we granted.

## II.   ANALYSIS

As a preliminary point of clarification, despite the majority of the proceedings below focusing on whether the Board acted arbitrarily under *American Beauty*, before this Court St. John has not challenged the Court of Appeals' holding that the Board exceeded its statutory authority in granting St. John's requested conditional use permit and variances.  Accordingly, that holding must stand and we will address only the arguments raised by St. John concerning the application of RLUIPA.

### A. Preservation

This Court must first address as a threshold matter whether St. John's RLUIPA claims were properly preserved for our review.  The Frederics assert, for the first time in this litigation, that St. John's claims under RLUIPA were not properly preserved because it failed to raise it as an affirmative defense[10] in its answer to the Frederics' circuit court complaint.  CR[11] 8.03 ("In pleading to a preceding pleading, a party shall set forth affirmatively. . . any . . . matter constituting an avoidance or affirmative defense.").

---

[10] Although RLUIPA is most commonly asserted as a cause of action, the Act itself contemplates that it may be raised as a defense.  42 U.S.C.A. § 2000cc-2(a) ("A person may assert a violation of this chapter as a claim or defense in a judicial proceeding[.]").

[11] Kentucky Rule of Civil Procedure.

14

St. John argues in response that the Frederics did not challenge its assertion of RLUIPA in either the circuit court or the Court of Appeals and instead responded to its arguments on the merits. Therefore, it contends, its RLUIPA defense was tried by the implied consent of the Frederics pursuant to CR 15.02, which provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." We agree.

The appropriate time for the Frederics to challenge St. John's use of RLUIPA as a defense was in their reply after St. John raised it for the first time in its motion for summary judgment. They did not. This Court has previously "determined that CR 15.02 is a tool for deciding cases on their merits rather than on the basis of gamesmanship." *Kroger Co. v. Jones*, 125 S.W.3d 241, 246 (Ky. 2004) (citing *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 145–46 (Ky. 1991)). And, CR 15.02 "may be invoked even though the appellate level has been reached." *Bowling Green-Warren Cty. Airport Bd. v. Long*, 364 S.W.2d 167, 171 (Ky. 1962). To dismiss St. John's RLUIPA claims at this juncture would in effect allow the Frederics to, whether intentionally or unintentionally, hold their lack of preservation card in their back pocket until the eleventh hour and prevail on a technicality. Civil Rule 15.02 was clearly intended to prevent such an outcome.

Moreover, although no "trial" occurred, the circuit court's grant of summary judgment was a resolution of the matter comparable to a trial, and CR 15.02 has been previously invoked in workers' compensation cases, which

15

never involve a jury or bench trial, but rather a hearing before an administrative law judge. *See, e.g.*, *Kroger Co. v. Jones*, 125 S.W.3d 241, 246 (Ky. 2004). Finally, we perceive no prejudice to the Frederics by St. John's invocation of CR 15.02: St. John's intent to assert RLUIPA has been in the background of this litigation since its motion for summary judgment, and the Frederics have asserted their arguments in opposition throughout these proceedings. *See Nucor*, 812 S.W.2d at 146 ("[T]he theory of implied consent does not turn on actual consent but on actual prejudice. The concept of actual prejudice is not related to winning or losing, but to being unable to present a defense which would have been otherwise available.").

Accordingly, we hold that St. John's RLUIPA defense was tried by the implied consent of the parties and is properly before us for decision.

## B. Merits

The United States Congress enacted The Religious Freedom Restoration Act (RFRA), 42 U.S.C.A. §§ 2000bb – 2000bb-4., in 1993 and its sister statute RLUIPA in 2000 "in order to provide very broad protection for religious liberty." *Holt v. Hobbs*, 574 U.S. 352, 356 (2015). RFRA's protections are much broader than RLUIPA's, as it commands that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government demonstrates that the application of the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 41 U.S.C.A. § 2000bb-1.(a)-(b).

16

Congress initially intended for RFRA to apply to both state governments pursuant to the Fourteenth Amendment and the federal government. However, in *City of Boerne v. Flores*, 521 U.S. 507 (1997), the United States Supreme Court held that Congress exceeded its authority under the Fourteenth Amendment in making RFRA appliable to the states. Accordingly, while RFRA is still appliable to the federal government, it has no authority over the sovereign states. In response to *Flores*, Congress passed RLUIPA, which applies to the states and their subdivisions pursuant to Congress' authority under the Spending and Commerce Clauses. *Hobbs*, 574 U.S. at 357. Consequently, it has a very narrow application in only two areas: land use regulations that impose substantial burdens on religious exercise or otherwise discriminate against or place a religious entity on non-equal footing with a non-religious entity, and government practices that impose a substantial burden on the religious exercise of institutionalized individuals.

Kentucky has since enacted its own religious freedom statute, the Kentucky Religious Freedom Restoration Act (KRFRA) that is nearly identical in its broad application to RFRA as it states that "[g]overnment shall not substantially burden[12] a person's freedom of religion" unless "the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest." KRS 446.350. However, although

---

[12] We note that this Court has never been called upon to define "substantial burden" under KRFRA.

17

KRFRA would be applicable to the facts of this case, St. John has not raised any claims under KRFRA nor has it asserted any claims under the Kentucky or the United States Constitution. Our focus herein is therefore limited to RLUIPA.

This Court has not yet had occasion to address RLUIPA. We therefore begin with the language of the Act which provides, in relevant part:

**(a) Substantial burdens**

**(1) General rule**

No government shall impose or implement a land use regulation[13] in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

**(A)** is in furtherance of a compelling governmental interest; and

**(B)** is the least restrictive means of furthering that compelling governmental interest.

**(2) Scope of application**
This subsection applies in any case in which—

. . .

**(C)** the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the

---

[13] The Act defines "land use regulation" as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership . . . interest in the regulated land[.]" 42 U.S.C.A. § 2000cc-5(5).

> government to make, individualized assessments
> of the proposed uses for the property involved.

42 U.S.C.A. § 2000cc(a).

Accordingly, a RLUIPA claimant first bears the burden of demonstrating that a governmental land use regulation, such as a zoning ordinance, imposes a substantial burden on his, her, or its exercise of religion. If, and only if, a claimant demonstrates that a substantial burden exists does the burden shift to the government to demonstrate that the imposition of that burden furthers a compelling government interest and is the least restrictive means of furthering that interest. *See also* 42 U.S.C.A. § 2000cc-2.(B).

Thus, the first question we must address is whether St. John has demonstrated that a denial of its request for a conditional use permit and variances pursuant to the Park Hills zoning code constitutes a substantial burden on its religious exercise. The action St. John wishes to take—building a grotto that honors the Virgin Mary's appearance at a grotto in Lourdes, France—constitutes a religious exercise. 42 U.S.C.A. § 2000cc-5.(7)(A) ("The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."). The dispositive issue, then, is whether the prevention of that pursuit constitutes a substantial burden.

The Act itself does not define substantial burden, and the United States Supreme Court has yet to define it under RLUIPA within the land use regulation context. This leaves us to look to the federal circuit courts for guidance, and we agree with the Frederics' assertion that the Sixth Circuit's

19

jurisprudence as delineated in *Livingston Christian Schools v. Genoa Charter Twp.*, 858 F.3d 996 (6th Cir. 2017) should be our polestar.

In *Livingston*, the Sixth Circuit's primary focus was formulating a workable standard to determine when a substantial burden had been imposed on the exercise of religion within the land use regulation context. It began that endeavor by discussing the only two cases from its circuit that addressed that inquiry, both of which were unpublished. *Id.* at 1002. One of those cases was *Living Water* which, the *Livingston* Court explained, "'decline[d] to set a bright line test' to determine whether a substantial burden exists," and instead announced a "framework to apply to the facts before [it]." *Id.* at 1002 (quoting *Living Water*, 258 Fed.Appx. at 737). That framework asked: "[D]oes the government action place substantial pressure on a religious institution to violate its religious beliefs or effectively bar a religious institution from using its property in the exercise of religion?" *Livingston*, 858 F.3d at 1002 (quoting *Living Water*, 258 Fed.Appx. at 737).

In her concurring opinion in *Living Water*, Judge Moore cautioned that the framework established by the opinion was inadvisable "because the effective-bar prong was 'so broad as to swallow the substantial-burden inquiry.'" *Livingston*, 858 F.3d at 1003 (quoting *Living Water*, 258 Fed.Appx. at 742 (Moore, J., concurring)). The *Livingston* Panel agreed with this assessment, as "the effective-bar prong would mean that, any time that a land use regulation completely barred the religious use of a property, a substantial burden would automatically exist." *Livingston*, 858 F.3d at 1003. The court

20

further noted that no other circuit had adopted the effective bar test, and that the test failed to consider factors that other circuits had considered under the substantial burden inquiry "such as whether a religious institution has ready alternatives to carry out its mission, or whether the religious institution's inability to use available land was self-imposed." *Id.* The *Livingston* court accordingly declined to follow the *Living Water* framework and sought to establish its own. *Id.*

In doing so, it began from the principle that "not just any imposition on religious exercise will constitute a violation of RLUIPA," and that the burden must have "some degree of severity to be considered 'substantial.'" *Id.* It reasoned that "taking seriously the requirement that a burden be 'substantial' is necessary in order to avoid an interpretation of RLUIPA that would exempt religious institutions from all land-use regulations." *Id.* Relying on opinions from its sister circuits, the *Livingston* court then adopted several factors to be considered in determining whether a substantial burden exists. *Id.* at 1004-05.

The first factor is "whether the religious institution has a feasible alternative location from which it can carry on its mission." *Id.* at 1004 (citing *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 352 (2d Cir. 2007)). The second is "[w]hether the religious institution will suffer substantial delay, uncertainty, and expense due to the imposition of the regulation[.]" *Livingston*, 858 F.3d at 1004 (internal quotation marks omitted) (quoting *Westchester*, 504 F.3d at 349). The third is whether "a plaintiff has imposed a substantial

21

burden upon itself. . . [f]or example when an institutional plaintiff has obtained an interest in land without a reasonable expectation of being able to use that land for religious purposes[.]" *Livingston*, 858 F.3d at 1004 (citing *Andon, LLC v. City of Newport News, Va.*, 813 F.3d 510, 515 (4th Cir. 2016); *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007)). And the fourth factor was "whether there is evidence that the municipality's decisionmaking (sic) process was arbitrary, capricious, or discriminatory." *Livingston*, 858 F.3d at 1004.

In this case, St. John asserts arguments under the first three *Livingston* factors. It first makes several conclusory statements that it has no other feasible alternative locations for construction of the grotto. It has not asserted that it could not construct a smaller grotto or shrine on the property it already owned, i.e., not on the acquired Burke Trust property. Doing so would prevent St. John from running afoul of KRS 100.253, which only prevents "the *enlargement or extension* of a nonconforming use beyond the scope and area of its operation at the time the regulation which makes its use nonconforming was adopted[.]" (Emphasis added). Moreover, we conclude that St. John's ability to build a smaller shrine or grotto than what it desires falls more into the category of a mere inconvenience than a burden with "some degree of severity[.]" *Livingston*, 858 F.3d at 1003 (citing *Int'l Church of the Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1067 (9th Cir. 2011) (explaining that a substantial burden "must impose a significantly great restriction or onus

22

upon [religious] exercise" (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004))); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) (concluding that a substantial burden is "more than an inconvenience"). We cannot conclude this factor weighs in St. John's favor.

Relying on *Catholic Healthcare Int'l, Inc. v. Genoa Charter Twp., Michigan*, 82 F.4th 442 (6th Cir. 2023), St. John next contends that denial of its requested conditional use permit and variance would cause it to suffer substantial delay, uncertainty, and expense and that it has not imposed a substantial burden upon itself. In *Catholic Healthcare*, Catholic Healthcare, Inc. created a prayer trail with fourteen "stations of the cross" depicting the story of Jesus' crucifixion on its 40-acre property; the trail could not be seen from outside the property. *Id.* The Township chose to treat the trail as the zoning equivalent of a church building and demanded that Catholic Healthcare apply for a special land use permit. *Id.* At a considerable expense, Catholic Healthcare submitted two such applications, both of which were denied. *Id.* The Township further demanded that the stations of the cross be removed from the trail, along with a stone altar and mural. *Id.* at 444-45. Catholic Healthcare sought a preliminary injunction from the Sixth Circuit pursuant to RLUIPA to allow it to restore all removed items from its prayer trail. *Id.* at 445.

Applying *Livingston*, the *Catholic Healthcare* Court first held that the religious institution had suffered substantial delay, uncertainty, and expense

23

due to the imposition of the Township's regulations. *Id.* at 449. It reasoned that "after two years of administrative proceedings and considerable expense, they remain unable to place the religious displays on their prayer trial." *Id.* It further held that Catholic Healthcare had not placed the burden on itself. *Id.* It expounded that "[t]his factor reflects that, when a plaintiff has good reason to know in advance that its proposed usage will be subject to an onerous review process, the burdens of that process are not likely to count as substantial for the purposes of [RLUIPA,]" and that "here, the Township's zoning ordinance gave plaintiffs little reason to expect the treatment they have received." *Id.* In particular, Catholic Healthcare would have had no reason to anticipate that the Township would consider the trail of religious displays a church building. *Id.*

Here, St. John—which bears the burden of proof—has presented no evidence of any expenses it incurred due to any mandate from the Board. Indeed, it concedes that in 2021 it "voluntarily" submitted an application for a grotto that was smaller in size than it originally intended. And, while it asserts that its saga to build the grotto began in 2017, the evidence before us begins with its 2021 application to the Board. Additionally, there can be no serious contention that St. John was uncertain of the likelihood that its applications would be denied pursuant to the applicable zoning ordinance. St. John's own application letter to the Board acknowledged that "the creation of any type of accessory space to the existing church *is not directly permitted by the current local zoning ordinance*" because the ordinance required it to be located adjacent to an arterial street to obtain a conditional use permit. (Emphasis added). For

24

the same reason, it cannot be said that St. John has not imposed a burden upon itself under *Catholic Healthcare.* Unlike the claimants in that case, St. John had every reason to know, and in fact explicitly acknowledged, that building the grotto was not permitted by the ordinance.

We accordingly hold that prohibiting St. John's request to build the grotto does not impose a substantial burden on St. John and accordingly does not run afoul of 42 U.S.C.A § 2000cc(a) of RLUIPA.

St. John further asserts that the ordinance is invalid on its face because it violates the "equal terms" provision of RLUIPA, which directs: "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C.A § 2000cc(b). Unlike subsection (a) of 42 U.S.C.A § 2000cc, subsection (b) does not require St. John to prove a substantial burden was imposed. Rather, St. John need only prove that the Park Hills ordinance treats a religious assembly or institution on less equal terms with a nonreligious assembly or institution.

St. John's sole argument under the equal terms provision of RLUIPA is that Section 10.4(C) of the Park Hills zoning ordinance requires churches and other buildings for the purpose of religious worship to be on an arterial street "while not requiring the same for cemeteries, nursery schools, public and parochial schools, public parks, playgrounds, golf courses, community recreation centers, libraries, and country clubs." This assertion is not correct. Section 10.4(C) states in its entirety:

25

C. CONDITIONAL USES: No building or occupancy permit shall be issued for any of the following, nor shall any of the following uses or any customary accessory buildings or uses be permitted until and unless the location of said use shall have been applied for and approved of by the Board of Adjustment, as set forth in Section 9.13:

1. Cemeteries.
2. Churches and other buildings for the purpose of religious worship, provided they are located adjacent to an arterial street.
3. Institutions for higher education, *provided they are located adjacent to an arterial street.*
4. Institutions for human medical care - hospitals, clinic sanitariums, convalescent homes, nursing homes, homes for the aged, *provided they are located adjacent to an arterial street.*
5. Nursery school.
6. Police and fire stations, *provided they are located adjacent to an arterial street.*
7. Public and parochial schools.
8. Publicly owned and/or operated parks, playgrounds, golf courses, community recreational centers, including libraries.
9. Recreational uses other than those publicly owned and/or operated, as follows:

    a. Golf courses.
    b. Country clubs.

(Emphasis added). Clearly, the ordinance does not put churches and other buildings for the purpose of religious worship "on less than equal terms with a nonreligious assembly or institution." 42 U.S.C.A. § 2000cc(b). Institutions for higher education, hospitals, sanitariums, convalescent homes, nursing homes, police stations, and fire stations must also be on an arterial street. Moreover, one of the categories St. John identifies as *not* being required to be on an arterial street are parochial schools, which *are* religious institutions. We

26

consequently hold that the Park Hills ordinance does not violate 42 U.S.C.A. § 2000cc(b) of RLUIPA.

As a final note, we clarify that while this Court agrees with the outcome reached by the Court of Appeals in this case—that no RLUIPA violation occurred—we disagree with its application of *Episcopal Student* to conclude that the *reason* no violation occurred was that while "application of the ordinance to prohibit construction of the grotto may make practice of religion somewhat more difficult for the church's congregation or the adherents of the Catholic faith broadly. . . the Zoning Ordinance is not inherently inconsistent with their religious beliefs." *Frederic*, 2022-CA-0867-MR, 2023 WL 8286391 at *7. Instead, we reiterate that henceforth *Livingston* and its progeny will be the applicable standard for determining whether a substantial burden was imposed on the exercise of religion within the land use regulation context.

### III.   CONCLUSION

Based on the foregoing, the Court of Appeals' holding that the Park Hills Board of Adjustment acted arbitrarily in granting St. John a conditional use permit and variances, which was unchallenged by St. John's appeal, stands. In addition, the Court of Appeals' holding that no violation of RLUIPA occurred is affirmed, albeit on different grounds. The Board's grant of a conditional use permit and variances to St. John for the construction of a grotto is hereby vacated.

All sitting. Bisig, Conley, Goodwine, Keller and Nickell, JJ., concur. Thompson, J. dissents by separate opinion.

27

Thompson, J., DISSENTING. While I agree with the majority opinion's conclusion that the Protection of Religious Exercise in Land Use and by Institutionalized Persons Act (RLUIPA) was not violated, this issue was the *only* issue presented by the motion for discretionary review filed by Missionaries of Saint John the Baptist, Inc. (the Church) and the *only* matter which should have been considered by this Court.

Since the singular issue to be determined by this Court was whether a RLUIPA violation had occurred, that is where all discussion should have been confined. I therefore must dissent with regard to the majority's repetition of the Court of Appeals' erroneous analysis of, and criticism of, the determinations made by the Park Hills Board of Adjustment (the Board) to authorize a variance and issue a conditional use permit.

I must write separately out of my real concern that the majority opinion's recitation of the procedural history in this matter—which should be understood as nothing more than dicta—will give even more litigious neighbors the false impression that this Court agreed with the Court of Appeals' erroneous, unnecessary and unreasonably broad determination of what constitutes an unlawful "enlargement or expansion of a nonconforming use" under Kentucky Revised Statutes (KRS) 100.253(2) or the identical local ordinance at issue. The majority opinion should in no way be read or interpreted as to restrict the authority of local boards of adjustment to exercise their discretionary authority in a manner that is both consistent with their authorizing ordinances and enabling statutes, and the overall will of the local citizenry they serve.

28

My fear is that, due to the dearth of caselaw in the Commonwealth on this issue, this Court's opinion may be viewed as an adoption of the Court of Appeals' erroneous analysis and henceforth serve to: (a) improperly limit the effectiveness and discretion of boards of adjustment to grant necessary and proper conditional use permits that are beneficial to the communities they serve; and (b) unlawfully restrict the vested property rights of landowners whose churches, residences, or businesses predate the adoption of, or amendments to, local zoning ordinances.

It is my conclusion that the Court of Appeals' determination that the planned grotto constituted an "enlargement or expansion" of "the church" mischaracterizes the nature of the intended walkway, path, patio, and statue as a matter of law and impermissibly limits *both* the legal authority granted to, and inherent discretion of, local boards of adjustment to grant conditional use permits and variances.

The genesis of the Court of Appeals' error was its obvious confusion regarding the true nature of the proposed grotto vis-à-vis our statutes and the Park Hills zoning ordinance. To begin, there are differences between a structure that serves as "a church" in the traditional sense of a building for worship with pews, a sanctuary and an altar, and "a church" in the broader sense which may incorporate a litany of additional separate or attached structures commonly found on many church campuses such as Sunday School classrooms, libraries, gyms, fellowship halls, staff offices and even private schools. Here, there was no structure to be constructed. There would have

29

been no excavation or blasting, foundations being poured, beams laid, framing constructed, trusses mounted, walls erected, heating and air-conditioning installed, or waste and water services dug and connected.

In this case, Missionaries of Saint John the Baptist, Inc., owns certain structures that have operated as "a church" in Park Hills since 1930, predating the creation of Park Hills's zoning code. Those church buildings only became a "non-conforming use," (a) *after* Park Hills adopted its zoning code, and (b) *after* Amsterdam Road on which the church is situated was designated a "collector street" instead of an "arterial street."

Having become a "non-conforming use" through no fault or action of its own, the church could not thereafter be "expanded or extended" per KRS 100.253(2) which reads in relevant part, "*the board of adjustment shall not allow the enlargement or extension of a nonconforming use beyond the scope and area of its operation at the time the regulation which makes its use nonconforming was adopted*[.]" (Emphasis added).

The Court of Appeals decided that construction of a grotto "*would constitute a change or an expansion of the church's nonconforming use*," seemingly deciding that *any* new garden with a statue installed by the church—regardless of use, size or impact—equates with an impermissible "expansion." No reasonable reading of the plain language of the statute supports such an overly broad interpretation.

First, a mere "change" is not prohibited by the statute. The statute specifically uses the terms "enlargement or extension." So, what is an

30

enlargement or an extension of a nonconforming use? The statute offers no additional guidance,[14] but I posit that the obvious answer lies in the *degree* to which a new structure or renovations would effectively "enlarge" the commercial utilization of the property in such a way that tangibly changes the property-owning entity itself which, in this case, has been a congregation's meeting and worship place for the last ninety-five years. Adding a grotto should never be considered an enlargement of a church any more than the addition of a sandbox would be considered a statutory "enlargement" of a daycare facility.

The Courts of our Commonwealth should not entertain the notion that additions of yard art, statues, patios, porches, picnic areas, outdoor seating and the like are outlawed by statute despite a landowner obtaining permission from his or her local zoning authority.

Here, we are talking about a grotto that is dimensionally more akin to a patio and would take up less area than that encompassed by a modest children's playground. The proposed grotto was not going to significantly, or in any way, alter the core use of "the church" by its presently existing congregation by changing or expanding the church's function or altering its breadth of operations. Therefore, there would be no "enlargement or extension of [the church] beyond the scope and area of its operation" and KRS 100.253(2)

---

[14] Without the General Assembly offering a clear definition for this language, its interpretation and application should be left to the sound discretion of the agencies who are vested, by the local citizenry, with its implementation. Absent proof of a clear abuse of discretion, clear illegality or fraud, local Board of Adjustments' determinations should be recognized as purely local/political matters into which our Courts should not, and are not allowed to, delve.

should not be viewed as an impediment to the Board's decision to allow for its construction.

My interpretation of what ***does not*** constitute an "enlargement or extension" of a nonconforming use is grounded in both our rules for statutory construction and our caselaw.

To discern the meaning of a statute, Courts are to construe "[a]ll words and phrases . . . according to the common and approved usage of language, but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed according to such meaning." KRS 446.080(4). We also must "accord to words of a statute their literal meaning unless to do so would lead to an absurd or wholly unreasonable conclusion." *Cosby v. Commonwealth*, 147 S.W.3d 56, 58–59 (Ky. 2004) (quoting *Bailey v. Reeves*, 662 S.W.2d 832, 834 (Ky. 1984)).

I assert the Court of Appeals reached just such an "unreasonable conclusion" and the construction of a mere grotto, by the Church, was no more prohibited by operation of KRS 100.253(2) than would the building of a gazebo, playground, or patio for the congregation's use and enjoyment.

A proper determination that the planned grotto is not an unlawful extension or enlargement of the Church is synchronous with published precedent in our Commonwealth. In *Board of Adjustments, Bourbon Cnty. v. Brown,* 969 S.W.2d 214, 215 (Ky. App. 1998), our Court of Appeals determined that an auction house, which was a non-conforming use, did not create an "impermissible extension or enlargement of a non-conforming use" in violation

32

of KRS 100.253(2), when it enclosed the front porch of its building with siding to add a bathroom for its customers *and* increased the number of auctions from two each week to three.

More pointedly, in *A.L. Carrithers & Son v. City of Louisville*, 63 S.W.2d 493, 497 (Ky. 1933), our predecessor Court determined:

> The extending the walls of the building so as to enclose space for the relocating the can-washing and by-products rooms **is not a vital and substantial change of the building in its characteristic or of the fundamental purpose of its creation, nor is it a change of such a nature as materially affects the**
>
> **realty itself, or its use, or the health, morals, or general welfare of the zoned district.** (citations omitted) . . . "Structural alterations" intended to be prohibited by the zoning ordinance are the changing an old building in such a way as to **convert it into a new or substantially different structure**.

(Emphasis added).

Nothing proposed by the Church in its application to construct a grotto constituted a "*vital and substantial change of the* [*Church*] *in its characteristic*[,] *or of the fundamental purpose of* [*the Church's*] *creation, nor is it a change of such a nature as materially affects the realty itself, or its use, or the health, morals, or general welfare of the zoned district.*" *Id.* (emphasis added).

In this matter, the Board correctly interpreted Section 9.11(B)(1) of its ordinance, which mirrors KRS 100.253(2), to not prohibit a grotto. Its ultimate decision to grant a permit for the grotto was also based upon its sound findings of fact; findings which were accepted by the circuit court and which the Court of Appeals was in no position to question. Specifically, the Board determined that "the proposed building and use at this particular location is necessary or

33

desirable to provide a service or facility which will contribute to the general well-being of the neighborhood or the community," and "the proposed building and use will not, under the circumstances of this particular case, be detrimental to the health, safety, or general welfare of persons residing or working in the vicinity, or injurious to property or improvements in the vicinity."

It is my position that any restriction on the powers of local boards of adjustment, alleged to be found in our statutes, must be read conservatively and strictly in order to give proper deference the boards who are making determinations within their expertise on matters of purely local interest, enforcement, and control. The very purpose of boards of adjustment is the ability to allow local property owners, upon application and after review, to "vary" from strict enforcement of the terms of local ordinances "when it finds that there are 'practical difficulties or unnecessary hardships in the way of carrying out the strict letter of such ordinance.'"[15]

This discretionary authority is the whole *raison d'etre* of a board of adjustment:

> As in the case with many other administrative agencies, **the board's creation resulted from legislative recognition that it is almost impossible to draft an ordinance of this type which will deal fairly and equitably with all situations. The board's function is to handle 'hard cases'** in such a way as to minimize the possibility of their reaching the courts (and endangering the

---

[15] Phillip P. Green Jr., *The Power of the Zoning Board of Adjustment to Grant Variances from the Zoning Ordinance*, 29 N.C. L. Rev. 245, 246 (1951), http://scholarship.law.unc.edu/nclr/vol29/iss3/2.

ordinance as a whole) or being turned into requests for amendment of the ordinance."

*Id.*

The overall purposes of local zoning ordinances, the interests of petitioning landowners and the interests of affected neighbors, are all much better served by locally controlled boards of adjustment than our Courts. The overarching goal of our statutes, when read as a whole instead of piecemeal, is to give boards of adjustment the flexibility, discretion *and authority* to address *local* issues just like the one presented here without litigating all the way through our circuit courts, the Court of Appeals and the Kentucky Supreme Court. This case presents us with an example of exactly what is *not* supposed to occur. The Park Hills Board of Adjustment agreed that the Church could build a grotto. Next, the Kenton Circuit Court (wherein Park Hills is situated) agreed that the Board could make that determination. Both the Board and the Circuit Court were, are, and remain answerable to local voters who are the final arbiters of what should and should not be built in their localities. The Park Hills Board of Adjustment is far more responsive to the residents of Park Hills and knows far better than the Court of Appeals or this Court what serves the best interests of its city as a whole.

Boards of adjustment were, by their very nature, designed to make zoning ordinances "work" by allowing for appointed local bodies to readily make necessary and warranted "adjustments" via variances and conditional use permits, when strict adherence to an ordinance's specific language would make

35

for unworkable or arbitrary results, such as here when a church is not allowed to build a grotto.

Lastly my determination is further supported by the deference our Courts must give to the rights of owners of real property whose land-interests and long-standing activities pre-date later zoning regulations: specifically, those like the church here which has existed for almost one hundred years. As recognized by the United States Supreme Court, while a nonconforming use may be deemed to be undesirable by a portion of the community, that same use constitutes a legitimate, vested property right that clearly enjoys broad constitutional protection. *Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926). *See also Darlington v. Board of Councilmen*, 140 S.W.2d 392 (1940).

Accordingly, I dissent as I cannot agree with the Court of Appeals' determination that the Park Hills Board of Adjustment's actions were either unlawful or unauthorized.

COUNSEL FOR APPELLANT:

Thomas W. Breidenstein
Breidenstein Legal Services, LLC

COUNSEL FOR APPELLEES, JOEL AND
ELIZABETH FREDERIC:

Christopher David Wiest
Chris Wiest, Attorney at Law, PLLC

Steve Doan
Steve Doan Attorney at Law

COUNSEL FOR APPELLEES, SHEILA BURKE,
SHELIA BURKE TRUST, CITY OF PARK HILLS BOARD
OF ADJUSTMENT, MARK KOENIG, CATHLEEN MATCHINGA,
CHARLES MEYERS, THOMAS MICHAEL,
ROBERT SWEET, JUSTIN ODOR:

Daniel Raymond Braun
Daniel R. Braun, PSC


COUNSEL FOR AMICUS CURIAE,
ADVOCATES FOR FAITH & FREEDOM:

J. Tyler Ward
Ward + Associates

Deborah J. Dewart
Advocates for Faith & Freedom


COUNSEL FOR AMICUS CURIAE,
LINDSAY AND MATT MOROUN RELIGIOUS
LIBERTY CLINIC:

Stephanie M. Bruns
Dentons Bingham Greenebaum LLP

Meredith H. Kessler
Lindsay and Matt Moroun Religious Liberty Clinic


COUNSEL FOR AMICUS CURIAE,
THOMAS MORE SOCIETY:

John O. Sheller
Steven T. Clark
L. Katherine Boren
Stoll Keenon Ogden PLLC

Joan M. Mannix
Thomas More Society

COUNSEL FOR AMICUS CURIAE,
CROSS & CROWN CITY CHURCH:

James B. Lind
Vorys, Sater, Seymour and Pease LLP

Daniel P. Dalton
Dalton & Tomich, PLC


COUNSEL FOR AMICUS CURIAE,
MR. DANIEL CAMERON:

Roger Byron
First Liberty Institute

Brian Pandya
Duane Morris LLP


COUNSEL FOR AMICUS CURIAE,
COMMONWEALTH OF KENTUCKY:

Matthew F. Kuhn
Solicitor General

John H. Heyburn
Principal Deputy Solicitor General

Daniel J. Grabowski
Assistant Solicitor General